Elvira VECCHIONE

v.

Helene **WOHLGEMUTH,** Secretary, De-
partment of Public Welfare, Common-
wealth of Pennsylvania, et al.

Civ. A. No. 73–162.

United States District Court,
E. D. Pennsylvania.

July 11, 1974.

**1362**

Joel N. Brewer, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff.

Marx S. Leopold, Gen. Counsel, Dept. of Public Welfare, Harrisburg, Pa., Cecil Maidman, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

Before HUNTER, Circuit Judge, and TROUTMAN and BECKER, District Judges.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a civil rights case, arising under 42 U.S.C. § 1983. It deals with the right of patients confined in state mental hospitals in Pennsylvania to control and manage their own property as against: (1) the right of the Commonwealth to summarily seize and control it for the duration of the hospitalization, without prior notice or hearing on the issue of the patient's competency to control that property; and (2) the right of the Commonwealth to appropriate part of the patient's property in satisfaction of the cost of care and maintenance, without prior or subsequent hearing on the correctness of the Commonwealth's assessment.

The case arises within the framework of sections 424 and 501 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 (Act), 50 P.S. §§ 4424 and 4501.[1] Section 501 provides that persons receiving diagnosis, treatment, care and rehabilitation at state mental hospitals are responsible for all costs thereof. Section 424 provides that, as to all persons who are not adjudged incompetent, civilly admitted or committed to a state mental hospital, the revenue agent at the hospital shall, without

---

1. The relevant portions of these provisions are quoted below.

§ 4424. *Funds of persons admitted or committed to State operated facilities*

Where no guardian has been appointed for a mentally disabled person admitted or committed to a State operated facility all money and other personal property of such person shall be handled in the following manner, unless the director determines that such person's recovery or well-being will be promoted by his own handling of such money or personal property:

(1) The authorized agent of the Department of Revenue shall, without application to any court, take custody of, receive and manage in accordance with this section any money or other personal property in such person's possession at the time he is admitted to a facility and any gifts, legacies, pensions, insurance payments, retirement benefits or payments, old age and survivors' insurance, or any other benefits or payments to which such person covered by the provisions of this act may be entitled.

(2) The revenue agent shall, upon the director's request, turn over to the director the sum of one hundred dollars ($100) to be used as such person's petty cash fund. Funds so held by the director shall be disbursed at his discretion to promote the welfare of such person. The revenue agent shall, upon the director's request, restore the balance in each such person's petty cash fund to one hundred dollars ($100). For special purposes, the director may request funds for such person up to five hundred dollars ($500).

(3) Unless a guardian has been appointed and qualified, the revenue agent shall hold, apply and dispose of all funds in accordance with regulations promulgated by the department.

(4) Whenever the money and other personal property of such person exceeds two thousand five hundred dollars ($2,500) in value, the revenue agent shall request the Department of Justice to apply for the appointment of a guardian of such person's estate in accordance with the act of February 28, 1956 (P.L. 1154), known as the "Incompetents' Estates Act of 1955."

(5) When such guardian has been appointed and qualified pursuant to this section or in any other manner, he shall be entitled to receive from the revenue agent all money and other personal property in the custody of such revenue agent belonging to the person for whom he has been

application to any court, seize any and all possessory property and present entitlements payable to such persons, manage them and appropriate from them for the cost of such person's care and maintenance as assessed by the revenue agent under § 501 of the Act. On the other hand, as to all persons who are adjudged incompetent,[2] § 424 requires the revenue agent to turn over all money or property of such persons to their guardians with a full and certified accounting. Payment of any monies to the Commonwealth in satisfaction of its § 501 claims out of the estates of those adjudged incompetent persons must be preceded by prior notice and prior judicial hearing and approval, by virtue of the Incompetents' Estates Act of 1955, 50 P.S. § 3101 et seq. In addition, § 424 requires the Commonwealth to initiate proceedings under the Incompetents' Estates Act of 1955 for appointment of a guardian of the estate, if none exists already, of any patient with assets in excess of $2,500 at the time of their admission to the mental institution. However, patients with $2,500 or less do not receive such an opportunity to have their assets protected by a guardian or court under the Incompetents' Estates Act of 1955.

Plaintiff contends that § 424 of the Act creates two classes of civilly admitted or committed patients for purposes of Due Process safeguards. One class, composed of all patients who have not been adjudged incompetent, is denied any prior notice or hearing before the Commonwealth takes control of those patients' assets and appropriates part of such assets to satisfy § 501 claims. Another class, composed of adjudged incompetent patients, is afforded both prior notice and hearing before the Commonwealth can seize control of their funds and appropriate them to satisfy § 501 assessments. Section 424 further separates these two classes by requiring the Commonwealth to seek, under the Incompetents' Estates Act of 1955, the appointment of a guardian for patients with assets in excess of $2,500, thereby augmenting the latter class. As to those patients with less than $2,500, however, the Commonwealth does not have to give them the benefit of notice or an opportunity for a hearing on whether they are incompetent, so these patients generally have no guardian or court to protect their assets, thus relegating them to the former, disadvantaged class.

Ironically, while these patients with more than $2,500 of assets receive prior notice and a hearing before being adjudged incompetent, if they are declared competent at such a hearing, the Commonwealth can then act under § 424 to take control of and appropriate their funds without any further notice or hearing. Plaintiff submits that there is

appointed guardian. All funds transmitted to the guardian shall be accompanied by a statement certified as true and correct and setting forth, in detail, a full accounting of such person's funds.

(6) Whenever such money and other personal property exceed two thousand five hundred dollars ($2,500) in value and the court rules that a guardianship is not appropriate, then such money and other personal property shall be handled in accordance with this section.

\*    \*    \*    \*    \*

§ 4501. *Liability of mentally disabled persons*

Whenever public funds are expended under any provision of this act on behalf of a mentally disabled person, the governmental body expending such funds may recover the same from such person subject to the regulations of the department and for this purpose liability is hereby imposed upon such person admitted, committed or otherwise receiving any service or benefit under this act for all costs, payments or expenditures with reference thereto, including but not being limited to the costs of admission or commitment, transportation, treatment, training, maintenance, complete care, partial care or aftercare and discharge.

Standards for assessment of liability used by the revenue agent are set forth by the Department of Public Welfare at DPW–MH/MR Manual § 5200, Appendix II.

2. A person may only be declared "incompetent" by a court of appropriate jurisdiction, as the term "incompetent" is defined in § 102(3) of the Pennsylvania Incompetents' Estates Act of 1955, 50 P.S. § 3102(3).

no legitimate state interest in differentiating between these two classes of patients and that the statutory classification offends the Equal Protection Clause of the Fourteenth Amendment. Plaintiff's second claim is that, to the extent that these statutes fail to provide prior notice and prior opportunity for full and fair hearing before taking control of and/or appropriating a mental patient's funds for payment of the Commonwealth's claims, they are invalid as contrary to the Due Process Clause of the Fourteenth Amendment.

Plaintiff Elvira Vecchione was, at the time that this action was brought, a patient at the Philadelphia State Hospital at Byberry (Byberry). She had not been declared incompetent and her assets were less than $2,500. Plaintiff sued in her own behalf and in behalf of all mental patients who are *sui juris* or are non-adjudged incompetent persons with assets less than $2,500 and who are civilly admitted or committed to Pennsylvania State hospitals for observation, diagnosis, care and treatment, and subject to §§ 424 and 501 of the Act.[3] In the prayer of her complaint, plaintiff sought declaratory and injunctive relief and also restitution of the sums withheld by the revenue agent.[4] Since the action sought to enjoin enforcement by a state officer of statutes of statewide application, a three-judge court was constituted.

On March 2, 1973, the District Court, sitting alone, and pursuant to a stipulation of the parties, ordered that temporary relief be afforded plaintiff until the case could be determined by the three-judge court.[5] Following a pretrial conference, the parties agreed that, with the exception of the testimony of two psychiatrists, the case could be determined on a stipulated record. A stipulation of facts was thereupon filed in which the defendants admitted the allegations contained in virtually all the paragraphs of plaintiff's complaint. For the hearing, plaintiff submitted an extensive brief upon the law. The Commonwealth submitted no brief, either before or after trial. For the reasons which follow, we agree with plaintiff's contentions that the provisions of § 424 in question offend the Equal Protection Clause and that as to the disadvantaged class, § 424 of the Act violates procedural Due Process guarantees of the Fourteenth Amendment. Accordingly, the permanent relief requested by plaintiff will be granted.[6]

## II. *Findings of Fact*

### A. *The Parties*

Plaintiff, Elvira Vecchione, is a seventy year old widow who is entirely with-

---

3. The Commonwealth did not object to plaintiff's motion for class action determination. However, during the hearing, counsel for plaintiff consented to withdraw the motion for class action since counsel for defendants agreed that the named plaintiff's case for injunction, declaratory judgment and restitution would not be moot, notwithstanding her discharge from Byberry. Even without this stipulation by defendants, the case would not be moot since plaintiff seeks restitution of funds still held by the Commonwealth, even after her discharge and up to the time of this opinion. While we do not need to rule on a class action motion in light of the withdrawal of this motion, we note that, since the Secretary of Welfare is a defendant, our resolution of the constitutional challenges raised by plaintiff has as far-reaching precedential effect as it would have had if the case were decided as a class action.

4. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343(3). Plaintiff's action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and F. R.Civ.P. 57.

5. On March 2, 1973, the Court approved a stipulation for temporary relief, wherein: (1) defendants were to make a full accounting to plaintiff of all plaintiff's monies appropriated by defendants from November 1, 1971, to February 27, 1973; (2) defendants were to return to plaintiff all monies belonging to plaintiff or held in her behalf from February 27, 1973, until determination of the instant action.

6. This opinion constitutes our findings of fact and conclusions of law under F.R.Civ.P. 52(a).

out means of support other than periodic Social Security OASDI benefits and her personal property valued at no more than $500.[7] On October 29, 1971, plaintiff was committed by Judge Ned L. Hirsh of the Court of Common Pleas of Philadelphia County to Byberry pursuant to § 406 of the Act, 50 P.S. § 4406, as a person in need of observation, care and treatment by reason of mental disability.[8]

Defendant Helene Wohlgemuth is Secretary of the Pennsylvania Department of Welfare, charged with the administration of the mental health and mental retardation program of Pennsylvania, including executive supervision of Byberry. Defendant Franklyn R. Clarke, M.D., is Superintendent of Byberry and is responsible under the Act for the immediate administration and operation of Byberry, including supervision of the office of Revenue Agent at that institution. Defendant Elwood N. Shoemaker is the Revenue Agent at Byberry and charged under §§ 424 and 501 of the Act with assessing liability for the costs of care and maintenance and taking custody of any money or other personal property in the possession of any patient at Byberry, and of any gifts, legacies, pensions, insurance payments, retirement benefits or payments to which any competent patient at Byberry, or any non-adjudged incompetent patient with assets less than $2,500 may be entitled.

### B. *The Statute as Applied to Plaintiff*

The plaintiff was confined at Byberry from October 29, 1971, to April 16, 1973. The Commonwealth concedes that she was at all times during her confinement competent to manage her financial affairs. Yet, by virtue of the statute, defendant Shoemaker is required to apply half of the plaintiff's money to maintain a petty cash reserve fund for each patient of up to $500, and uses the other half and any funds in excess of the $500 reserve to pay for the assessed costs, without prior adjudication of liability or attachment proceedings of any kind. In terms of the plaintiff's property, defendant Shoemaker, without notice and hearing or explanation, acting pursuant to §§ 424 and 501, summarily seized and appropriated $1,253.85 of her Social Security OASDI benefits to pay the alleged debt incurred by her for her care and treatment at Byberry. In the same manner, the Commonwealth seized control of an additional $1,356.63 of her Social Security OASDI benefits, and interest thereon, and deprived her of control thereof until her discharge. This $1,356.63 was turned over to plaintiff as follows: $332.39 was returned in cash at the time of discharge; $766.64 was spent by plaintiff from her petty cash fund as authorized by her attending physician over the course of her hospitalization, and, pursuant to this Court's Temporary Restraining Order, $257.60 was returned to plaintiff after she had established a permanent residence at 2024 Green Street, Philadelphia, Pa. in May 1973.

Under 50 P.S. §§ 4501 and 4424, the Commonwealth did not afford plaintiff the opportunity to challenge the validity and amount of the underlying indebtedness at any time prior or subsequent to appropriation of monies for alleged patient indebtedness for care. Under Pennsylvania law and defendants' procedures authorized by §§ 424 and 501 of the Act, defendants are not required to afford plaintiff a subsequent opportunity for hearing, final determination of liability and restoration of her property; in fact, the Commonwealth is not obligated to initiate court action or make an accounting of any kind to plaintiff or to

---

7. During her hospitalization at Byberry, plaintiff received $500 cash, representing her share of an estate that was settled. While still hospitalized, plaintiff placed this $500 in the highest interest bearing passbook savings account available at First Pennsylvania Banking & Trust Co.

8. Byberry is a state hospital operated by the State Department of Public Welfare under §§ 202 and 203 of the Act, 50 P.S. §§ 4202 and 4203, and funded by the Commonwealth under 50 P.S. § 4507(a)(1).

the court at any time. On the other hand, adjudged incompetent patients and non-adjudged incompetent patients with property and present entitlements in excess of $2,500 were afforded both prior notice and hearing on the correctness of assessments for hospital care.

Plaintiff contends that she was deprived of procedural due process by the appropriation and application of her funds to the Commonwealth's claim without notice and hearing. Her claim is buttressed by her enumeration of the defenses which she would interpose to the Commonwealth's claim, but which she had no opportunity to assert because of the operation of the Act. While we do not need to reach a judgment on the merits of these defenses, we note that plaintiff has not received any hearing or opportunity to raise these contentions in a challenge to the Commonwealth's assessment against her for the cost of her hospitalization care and maintenance. These defenses include the following:

(a) Plaintiff alleges that imposition of any liability upon her would impose an undue financial and psychological hardship upon her, and accordingly would be excused, modified or abated under § 504 of the Act,[9] and under Commonwealth v. Heiser, 95 Montg.Cy.L.R. 152 (Montg.C.P.1972).

(b) Absent a knowing voluntary and intelligent assignment of Social Security OASDI benefits by the plaintiff, of which there was none, she alleges that such benefits are under the express terms of 42 U.S.C. § 407 insulated from claims of creditors, including the state

as provider of services. *See* Philpott v. Essex County Welfare Board, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973). *Accord,* In re Algier's Estate, 43 Pa.D. & C.2d 351 (Chester Cy.O.C. 1967).

(c) Plaintiff alleges that throughout her hospitalization Byberry afforded her less than constitutionally required treatment under Wyatt v. Stickney, 344 F. Supp. 387 (M.D.Ala.1972), thereby prolonging her hospitalization and the costs therefor or warranting that she not have been committed at all.[10] Alternatively, plaintiff contends that the value of her care, on a *quantum meruit* basis or otherwise, was less than the value of her benefits appropriated by the Commonwealth. To support this contention, plaintiff notes that, until enjoined by Temporary Restraining Order dated March 2, 1973, the Commonwealth continued to appropriate at least 50% of plaintiff's Social Security OASDI benefits, despite the fact that from January 19, 1973, plaintiff no longer required hospitalization.

(d) Throughout the period that plaintiff resided at Byberry, in order to feel active and useful, she performed maintenance and housekeeping work consisting principally of making 16 beds per day and occasionally mopping floors for one to two hours per day, seven days per week, despite the efforts of defendants and their agents and employees to discourage plaintiff from performing any work because of her heart condition. Given a due process hearing, plaintiff would assert an offsetting claim for the

---

9. 50 P.S. § 4504 provides in relevant part: [T]he secretary . . . shall have the power . . . to abate, modify, compromise or discharge the [501] liability so imposed provided:

(1) He is satisfied that the imposition of such liability would: (i) result in the loss of financial payments or other benefits from any public or private source which a mentally disabled person would receive, would be eligible to receive or which would be expended on his behalf except for such liability, or (ii) result in a substantial hardship upon the mentally disabled person, a person owing a legal duty

to support such person or the family of either, or (iii) result in a greater financial burden upon the people of the Commonwealth, or (iv) create such a financial burden upon such mentally disabled person as to nullify the results of care, treatment, service or other benefits afforded to such person under any provision of this act.

10. Plaintiff concedes that the duration of her hospitalization was prolonged in part by the unavailability of an aftercare placement facility deemed suitable for her by Byberry.

value of this work performed by her which benefitted the Commonwealth, under § 504 of the Act, as interpreted by Estate of MacKnight, 58 Pa.D. & C.2d 794 (Phila.O.C. en banc, 1972) (Consent Decree). *See also* Downs v. Dept. of Public Welfare, 368 F.Supp. 454 Civil No. 73–1246 (E.D.Pa. filed May 7, 1974) (consent decree ordering Commonwealth as of Dec. 7, 1974, to pay patients for work which benefits mental institution).

C. *The Competency of Plaintiff and Other Mental Patients to Handle Their Own Finances*

In addition to appropriating plaintiff's assets, the Commonwealth also took control of them under 50 P.S. § 4424. This provision allows the Commonwealth to entirely divest plaintiff throughout her hospitalization of control of her own personal property and entitlements, except for small amounts which it granted or withheld at the discretion of the defendants herein and their officers and agents.

Throughout the period of her hospitalization, plaintiff was and she still remains *sui juris*. Defendants concede that plaintiff was and is competent to handle her own funds. At the hearing, two psychiatrists, with impressive qualifications in the field of treating mental patients, testified that mental patients like plaintiff, in general, are no less able to handle their own assets than the population at large. The psychiatrists acknowledged that for a brief period of a few days after patients are admitted to a mental institution, a large percentage of them may be in an acute or traumatic stage that would prevent them from handling their own funds during that brief period. This situation is analogous to the incapacity of a nonmental patient, such as an accident victim, who may not be able to manage his own funds for a period while his injury is acute. But the experts opined that such a brief incapacity should not be grounds for indefinitely denying such mental or nonmental patients control over their assets.

The psychiatrists also testified that depriving mental patients of any control and responsibility over their own funds would tend to prolong a person's stay in a mental hospital, while giving them such control and responsibility is therapeutic. Plaintiff, in her brief, and these doctors referred to numerous studies to support these contentions. *See* Hearings Before the Subcomm. On Constitutional Rights of the Sen. Comm. on the Judiciary, 87th Cong. 1st Sess. 1961; Allen, Fenster and Weihoffer, Mental Impairment and Legal Incompetency (Prentice-Hall, 1968); The Mentally Disabled and the Law, Lindman (ed.) (Chicago, 1961); Greenblatt, York and Brown, From Custodial to Therapeutic Patient Care in Mental Hospitals (Russell Sage Foundation, 1955); Williams, "Money and the Therapeutic Process," 18 Canada's Mental Health 20 (1970); Cummings and Cummings, Ego and Milieu (Prentice-Hall, 1962). The medical judgment that mental patients are not prima facie incapable of handling their own financial affairs is apparently so well-established that on November 4, 1971, the Board of Directors of the National Association for Mental Health adopted a "Position Statement on Civil Rights of Mental Patients" which read at item 3:

The fact that institutional care is required should not in and of itself create a status of incompetency either by operation of law or administrative practice. Admission to a service or treatment program should not give rise to a presumption of inability to manage one's affairs or exercise jural and civil rights.

At the hearing, the Court pressed the Commonwealth as to its position concerning the validity of these treatises and of the expert testimony elicited. Counsel for the Commonwealth responded that the Commonwealth accepted the view that "mental patients are, barring an adjudication of incompetency, capable of managing their financial affairs." [Partial Transcript at 58.] In light of the impressive and un-

contested evidence on this point and the Commonwealth's significant concession, we reject the existence of any *presumption* that mental patients, including plaintiff, are less capable of handling their assets than the public at large.

## III. *Discussion*

### A. *The Equal Protection Claim*

Under the rubric of the Equal Protection Clause, the Supreme Court has repeatedly held that statutory schemes may treat classes of citizens differently only if the statutory classifications are rationally related to the purpose of the statute. *E. g.,* San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Dandridge v. Williams, 397 U.S. 471, 90 S. Ct. 1153, 25 L.Ed.2d 491 (1970). As the Court explained in Rinaldi v. Yeager, 384 U.S. 305, 308–309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966):

> The Equal Protection Clause . . . imposes a requirement of some rationality in the nature of the class singled out. . . . [T]he Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have "some relevance to the purpose for which the classification is made." (citations omitted.)

■ The Pennsylvania statute and collection practice challenged herein fails to meet this minimal rationality standard of equal protection. Section 424 establishes two classes of civilly admitted or committed mental patients. The first consists of all patients adjudged incompetent by a court of appropriate jurisdiction. The second class consists of all patients not adjudged incompetent. As noted, since under § 424(4), the Commonwealth must initiate proceedings under the Incompetents' Estates Act of 1955 to seek a guardian for all patients with assets in excess of $2,500, the first class is thus augmented, although if such patients are not adjudged incompetent, then they fall into the second, disadvantaged class, which also perforce includes those with assets less than $2,500. As to the first class, payment to the Commonwealth out of each incompetent's estate must, by force of Pennsylvania law governing administration of incompetents' estates, be preceded by notice to all interested parties and by judicial hearing and approval. As to the second class (in which plaintiff finds herself), §§ 424 and 501 expressly authorize defendants to summarily deprive this class of patients of custody and control of their property and apply it to pay hospital costs without prior or subsequent notice and hearing as to any patient indebtedness or the availability of patient property in satisfaction thereof.

The Commonwealth has pointed to no rational basis, not even revenue raising, for classifying mental patients in this manner for any purpose set forth in the Act. In fact, when viewed in light of § 504(a) of the Act, which is calculated to alleviate the harsh economic and psychological consequences to indigent mental patients of strict imposition of § 501 costs, the practices authorized by §§ 424(1) and 501 appear counter-productive and internally inconsistent with the goals of the Act. More affluent incompetent mental patients would presumably be better able to afford the costs under § 501 and would therefore be a great source of income. Maximizing the right of such persons to resist imposition of liability, while minimizing the rights of all others seems arbitrary and capricious.

Under the statutory scheme, the Commonwealth is able to summarily seize and appropriate assets of a patient not adjudged incompetent, while having to provide notice and opportunity for a hearing to a patient adjudged incompetent, but whose financial interests are protected by a guardian or a court under the Incompetents' Estates Act of 1955. Such a differentiation allows the Commonwealth to exercise stronger credi-

tor's rights against competent patients than as against incompetent patients, without any regard to the liability or financial capability of these patients to meet their obligations. Furthermore, in view of our rejection of any presumption that mental patients are less capable of handling their assets than the public at large, it is arbitrary to treat those who are not adjudged incompetent as if they were not able to handle their own funds, and those who are adjudged incompetent as if they were, since the Commonwealth must then deal with a guardian or court under the Incompetents' Estates Act of 1955.

One possible argument for the Commonwealth might stem from § 201 of the Incompetents' Estates Act of 1955, 50 P.S. § 3201, which dispenses with the need for appointment of a guardian for incompetents with assets less than $2,500. However, that statute expressly and without exception requires prior judicial approval of the receipt and use of all or any part of an incompetent's assets. The $2,500 line in the Incompetents' Estates Act is drawn since it would be difficult to find guardians willing to serve for the nominal fees available from such small estates. But as a safeguard to preserve the property

of incompetents with less than $2,500, the Incompetents' Estates Act still requires court authorization to dispose of such assets. Section 424 of the Act herein challenged lacks both the rational basis and the safeguards in the Incompetents' Estate Act. It is not a rational basis for the Commonwealth to apply the $2,500 classification from one statute to another without any relation to the purposes of the Act in question.

In sum, we find that the classification of patients in state hospitals under § 424 is irrational, arbitrary and so wholly unrelated to any purpose of the law in which the classification is made that it is impermissible on its face under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.[11]

### B. *The Procedural Due Process Claim*

■ Although we have addressed plaintiff's equal protection claim first, reflection reveals that her equal protection claim is essentially a claim for due process, since the invidious classification deprived plaintiff of any notice or opportunity for a hearing before or after the Commonwealth took control of and appropriated plaintiff's assets. We find

11. Since the Act under challenge does not meet the minimum rationality test of the Equal Protection Clause, *a fortiori* it will not satisfy a stricter scrutiny test requiring a compelling state interest when there are suspect classifications or fundamental interests involved. For cases finding fundamental rights, *see, e. g.*, Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (right to travel) ; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel) ; Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote). For cases dealing with suspect classifications, *see, e. g.*, Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (nationality) ; Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (race). It is still unclear when wealth is considered a "suspect classification." Compare Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (state prohibited from barring access to divorce courts solely be-

cause of inability to pay court fees) (Douglas, J. concurring argues equal protection ground, while Harlan, J., writing for majority, based decision on due process rationale) ; Harper v. Virginia Board of Education, *supra* (wealth improper as criteria for voting right) ; and Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (indigency not justifiable grounds for denying free trial transcript), *with* San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 1289, 36 L.Ed.2d 16 (1973) (and cases cited therein) (wealth discrimination in real estate taxes as basis for public school financing alone not basis for strict scrutiny). A recent law review note argues that "mental illness" is a constitutionally suspect classification. Note, "Mental Illness: A Suspect Classification?," 83 Yale L.J. 1237 (1974). However, in light of our finding under the minimal rationality test for equal protection, we do not need to resolve whether fundamental rights and/or suspect classifications require a strict scrutiny test in this case.

that, in addition to violating the Equal Protection Clause, provisions of section 424 of the Act are also unconstitutional because they fail to provide the procedural due process required by the Fourteenth Amendment. The Supreme Court has ,said that the Fourteenth Amendment sets forth the

> . . . root requirement that an individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.

Fuentes v. Shevin, 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1972). *See also* Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

▆ In the instant case, property rights entitled to constitutional protection are at stake.[12] As in the case of the welfare benefits involved in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and the driver's license involved in Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L. Ed.2d 90 (1971), the Social Security benefits or other income patients receive and which defendants have intercepted and appropriated under §§ 424 and 501 of the Act are a matter of statutory entitlement to plaintiff, and thus are property within the meaning of the Due Process Clause. Goldberg v. Kelly, *supra*, 397 U.S. at 262, 90 S.Ct. 1011. Moreover, defendants' practice of taking

custody and control of all monies in addition to the funds appropriated by the Commonwealth deprives plaintiff of her rights to use of her property. *Cf.* Fuentes v. Shevin, 407 U.S. 67 at 86, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). *See also* Sniadach v. Family Finance Corp., 395 U.S. at 342, 89 S.Ct. 1820 (Harlan, J. concurring).

In our view, the plaintiff's suit challenges a more objectionable practice than that struck down in *Fuentes.* Here, unlike *Fuentes*, the state interference with the plaintiff's right to use and control her property is in behalf of itself as creditor. *See* In re Estate of Rabe, 437 Pa. 72, 77–78, 261 A.2d 603 (1970). Here, unlike *Fuentes*, there is no provision for posting of a counter-bond by the plaintiff, or any analogous procedure, by which the plaintiff can seek restoration of her property pending final determination of liability. Finally, the *Fuentes* court struck down the Florida replevin statute even though it included a full subsequent hearing. In the instant action there is no requirement that Pennsylvania ever afford plaintiff a subsequent hearing, nor any administrative procedure called to our attention for doing so.

While the recent Supreme Court decision in Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), narrowed the scope of the *Fuentes* language, it did not discredit it for the purposes of the instant case. *Mitchell* held that a Louisiana sequestration procedure met due process requirements considering the respective interests of the buyer and seller and the fact that judicial control over the process

---

12. In addition to plaintiff's traditional property rights in her possessory assets and her statutory entitlements, such as her social security benefits, plaintiff claims a constitutional right incident to the guarantee of liberty in the Due Process Clause to control her own property and "to receive such individual treatment as will give . . . [her] a realistic opportunity to be cured or to improve . . . her mental condition." Wyatt v. Stickney, 325 F.Supp. 781, 784 (M.D.Ala. 1971). *See also* Rouse v. Cameron, 125 U.

S.App.D.C. 366, 373 F.2d 451 (1966); Nason v. Supt. of Bridgewater State Hospital, 353 Mass. 604 at 614, 233 N.E.2d 908 at 914 (1968). In light of our ruling above that the statute under challenge deprives plaintiff of her traditional property rights without due process, we need not reach the issue of whether they also deprive her of these alleged constitutional claims of "liberty" under the Due Process Clause of the Fourteenth Amendment.

minimized the risk of wrongfully giving the creditor interim possession. In the instant case, on the other hand, the respective interests of the parties to plaintiff's assets are significantly different, with the balancing clearly tipping in plaintiff's favor. And, unlike *Mitchell*, where a court must approve the ex parte sequestration order and provide notice and opportunity for a full subsequent hearing on the merits, here there is no judicial control or notice and hearing either before or even after the seizure and appropriation of plaintiff's property. Hence, we find the basic due process principles of *Fuentes* and its progeny, including *Mitchell*, still applicable to the case at bar.

Analogous to the instant case is Dale v. Hahn, 486 F.2d 76 (2d Cir. 1973), aff'g Unreported District Court Order, on remand from 440 F.2d 633 (2d Cir. 1971), wherein New York's failure to provide adequate notice prior to the appointment of a committee to receive and disburse plaintiff's assets was challenged as violative of the Due Process Clause and of 42 U.S.C. § 1983. The *Dale* court was faced with the circumstance that a patient was not adequately notified of the pendency of a judicial proceeding in which the state declared her incompetent and suspended her right to possession, use and control of her property. In the instant case, the state does not even provide a judicial hearing, let alone notice thereof. *A fortiori* the practice assailed herein must be set aside as violative of the Due Process Clause.[13]

At oral argument the Commonwealth attempted to justify its practice of taking custody of plaintiff's property before its right to appropriate the property can be judicially established, on the theory that there is an immediate threat of destruction, loss or mismanagement of the sought-after property by this type of plaintiff. The Commonwealth argument must fail for two reasons. The first problem with the Commonwealth's argument is that even if the Commonwealth's practice was generally justifiable under the facts, the statutes in question are not sufficiently narrowly drawn to track their alleged purpose. A similar type of class presumption[14] was raised and rejected in Fuentes v. Shevin, *supra* with respect to the entire population of debtors there subject to prejudgment replevin. The statutes assailed herein, as in *Fuentes*, are not drawn to meet the "unusual condition" of an immediate risk of loss or destruction posed by certain individuals, but are aimed at an entire undifferentiated population.

---

13. *See also* McConaghley v. City of New York, 60 Misc.2d 825, 304 N.Y.S.2d 136 (N.Y.Civ.1969). In *McConaghley*, the trial court set aside appropriation by the New York Department of Hospitals of $442 for alleged cost of care. This appropriation had been taken out of the $1450 found on the mentally disabled patient at the time of her commitment to Bellevue Hospital, under a Department of Welfare regulation providing for summary seizure of patient property to pay hospital costs. The court viewed this appropriation as prejudgment garnishment analogous to that struck down by the Supreme Court in Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed. 2d 349 (1969).

14. The Commonwealth's presumption that all mental patients are incompetent to manage their own financial affairs becomes irrebuttable in some cases. If a mental patient has assets in excess of $2,500, the Revenue Agent, under § 424(4) of the Act, 50 P.S. § 4424(4), must request that the Department of Justice seek the appointment of a guardian for that patient, under the Incompetents' Estates Act of 1955. If, however, the court of appropriate jurisdiction declares such patient to be *sui juris* and refuses to appoint a guardian, the Revenue Agent may continue to summarily seize, control and appropriate such patient's assets under § 424(6) of the Act, 50 P.S. § 4424(6). We find that this type of irrebuttable presumption is not only factually unfounded, but also an unconstitutional deprivation of due process rights. *Cf.* Bell v. Burson, 402 U.S. 525, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (presumption of fault for class of uninsured motorists); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L. Ed.2d 551 (1972) (presumption that unmarried fathers are unfit parents); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed. 2d 63 (1973) (presumption of nonresidence of class of college students).

*See also* Lebowitz v. Forbes Leasing & Finance Corp., 326 F.Supp. 1335, 1349 (E.D.Pa.1971), aff'd 456 F.2d 979 (3d Cir.), cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972).

The second and even more fundamental problem with the Commonwealth's attempted justification of the statutes involved is that its factual underpinning, *i. e.*, that mental patients are presumptively incapable of handling their own funds, has been stripped by the Record in this case. If there were a necessary correlation between hospitalization and incompetency, the statutes could perhaps be justified. However, in our findings of fact we have rejected the Commonwealth's hypothesis that mental patients may be presumed less competent to handle their own assets than the public at large. Hence there is no legitimate justification for the Commonwealth's interference with plaintiff's custody and control of her property without an adjudication that she was incompetent to manage it. Defendants concede, and we have found, that plaintiff was entirely competent to manage her affairs throughout her hospitalization and up to the present time. Moreover, the Commonwealth's own statutes reject the automatic correlation between hospitalization and incompetency. If the Commonwealth's hypothesis that all mental patients present an immediate risk of loss or destruction of property were in fact true, all mental patients could be adjudged legally incompetent. Pennsylvania's Incompetents' Estates Act of 1955, however, requires not just evidence of mental illness, but of three factors: (1) mismanagement, (2) mental illness, *and* (3) a causal nexus between the two.[15] In re Streda's Estate, 12 Pa. D. & C.2d 523 (Del.Cy.O.C.1957).

In view of our conclusion that § 424, read in conjunction with § 501, of the Act offends the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution in the general context of this case, relief must be granted as requested by the plaintiff.

---

15. Section 102(3) of the Incompetents' Estates Act, 50 P.S. § 3102(3), defines an incompetent as ". . . a person who, because of mental infirmities of old age, mental illness, mental deficiency, drug addiction or inebriety, is unable to manage his property, or is liable to dissipate it or become the victim of designing persons."

One critic of the Pennsylvania-type incompetency statute suggests that the causal nexus between mismanagement and mental illness is ignored by the courts, thereby making mental patients who have mismanaged property in any particular circumstance especially vulnerable to indiscriminate adjudications of incompetence. Note, "The Disguised Oppression of Involuntary Guardianship: Have the Elderly Freedom to Spend?", 73 Yale L.J. 677 (1964).