Elvira **VECCHIONE** and Walter **Buress** and all other persons similarly situated

v.

Helene **WOHLGEMUTH**, Secretary, Department of Public Welfare, Commonwealth of Pennsylvania, Franklyn R. Clarke, M. D., Superintendent, Philadelphia State Hospital at Byberry, Elwood N. Shoemaker, Revenue Agent, Philadelphia State Hospital at Byberry, Frank Beal et al., Defendants-Appellants.

No. 76–2631.

United States Court of Appeals,
Third Circuit.

Argued March 29, 1977.

Decided June 14, 1977.

---

Norman J. Watkins, Allen C. Warshaw, J. Justin Blewitt, Jr., Deputy Attys. Gen., Chief, Civil Litigation, Robert P. Kane, Atty. Gen., Department of Justice, Harrisburg, Pa., for appellants.

David Ferleger, Judy Greenwood, Jonathan M. Stein, Philadelphia, Pa., for appellees.

Before VAN DUSEN, GIBBONS and GARTH, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

This case involves an appeal from a denial of a motion, pursuant to Fed.R.Civ.P. 60(b), to vacate a consent decree. *Vecchione v. Wohlgemuth,* 426 F.Supp. 1297 (E.D.Pa.1977). The consent decree was entered in settlement of a contempt proceed-

ing against certain officials of the Commonwealth of Pennsylvania, who defied an injunctive order of a three-judge federal district court. That injunctive order, which is not before us for review, resulted from a fully litigated case. We affirm the denial of the Rule 60(b) motion.

On January 19, 1973, Elvira Vecchione filed a complaint on her own behalf and on behalf of a class consisting of patients in Commonwealth mental hospitals who were not adjudicated incompetent to manage their own property. The gravamen of the complaint was that sections 424 and 501 of the Pennsylvania Mental Health and Retardation Act of 1966, 50 P.S. §§ 4424 and 4501, were unconstitutional as applied to the plaintiff class, in that the statutes permitted the Commonwealth to take their property in satisfaction of costs of care or maintenance without a prior or subsequent hearing on the correctness of the Commonwealth's assessment. The statutory scheme was alleged to violate the equal protection clause of the fourteenth amendment, in that it permitted such appropriation of the property of competent patients, while it required notice to and hearing for guardians of adjudicated incompetents. It was also alleged to violate the due process clause as interpreted by the Supreme Court.[1] Since the complaint sought injunctive relief against enforcement of a statute of statewide application a three-judge district court was convened. On February 12, 1973, Marx S. Leopold, Esq., appeared for the defendants, and filed a motion to dismiss the complaint for lack of jurisdiction and failure to state a claim upon which relief can be granted. Thereafter, Assistant Attorney General Leopold participated in litigation of the case in the district court. Eventually the plaintiff prevailed.[2] The district court order provided:

"AND NOW, this 11th day of June 1974, IT IS ORDERED, ADJUDGED and DECREED that:

1. Section 424 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4424, is unconstitutional on its face and as applied in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution to the extent that it denies: (a) plaintiff and other patients who are not adjudged incompetent adequate notice and opportunity to be heard before taking control of these patients' assets under 50 P.S. § 4424 and/or appropriating such assets under 50 P.S. § 4501; and (b) plaintiff and other patients with assets of $2,500 or less the protection of their assets that a guardian or a court would provide if they were adjudged incompetent under the Incompetents' Estates Act of 1955, 50 P.S. § 3101 et seq.

2. The defendants are enjoined from applying 50 P.S. §§ 4424 and 4501 in the unconstitutional manner set forth above.

3. The Commonwealth shall restore to plaintiff all of plaintiff's monies held or taken by the Commonwealth or its agents from October 29, 1971, to April 6, 1973, when plaintiff was hospitalized at the Philadelphia State Hospital at Byberry." (Appendix at 150a).

No appeal was taken from this final judgment, and no Rule 60(b) motion has been addressed to it, despite the fact that it provided for repayment of money.

Seven months later a patient, Walter Buress, alleging that he was a member of the class protected by the decree, moved to intervene. He contended that in defiance of the decree the defendants were continuing to take his social security benefit checks without a hearing, and to apply the proceeds toward what they thought he owed for care and maintenance. He moved to have the defendants held in contempt of court. On March 13, 1975, the district court

---

**1.** *See North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

**2.** *Vecchione v. Wohlgemuth,* 377 F.Supp. 1361 (E.D.Pa.1974).

issued an order directing the defendants and their attorney, Assistant Attorney General Marx S. Leopold, to show cause why they should not be held in contempt.

In fact the court's judgment had never been implemented. Instead, Commonwealth officials had continued to appropriate, without a hearing, social security checks of competent mental hospital patients amounting to several millions of dollars.

The original injunctive decree was merely negative in terms. It prohibited reliance on the existing statutory scheme, but left the Commonwealth free to design an appropriate due process substitute. But until one was designed it was clear that the agents of the Commonwealth were required to cease taking the patients' property. They did not. Faced, in the contempt proceeding, with prospect of a coercive contempt decree, the defendants negotiated with the attorneys for the plaintiff class and with the district court, and on April 4, 1975, entered into a stipulation and order as follows:

AND NOW, this 4th day of April, 1975, upon consideration of the agreement of the parties as to proper procedures and regulations for implementation of this Court's Opinion and Order of July 11, 1974, it is hereby ORDERED and DECREED:

1. The regulations attached hereto as Exhibit A shall be fully adopted by the Defendant Secretary of Public Welfare Frank Beal, on behalf of the Department of Public Welfare, and said regulations shall be published as immediately effective in the Pennsylvania Bulletin within fifteen (15) days. Within twenty (20) days, Defendant Beal, and his counsel, Marx Leopold, shall certify under oath to this Court that such adoption and publication has occurred.

2. The Defendants Beal, Clarke and Shoemaker shall arrange for payment to the named Plaintiff, Elvira Vecchione, in full the sum of $1,253.85, representing the sum wrongfully withheld from her, within ten days. Within fifteen (15) days, said defendants and their counsel, Marx Leopold, shall certify to this Court under oath that such payment has taken place.

3. Defendant Frank Beal, Secretary of the Department of Public Welfare, shall order, within fifteen (15) days, the Directors and Revenue Agents of every state mental institution and facility to determine and report to Defendant Beal the names and addresses of all present and former patients whose funds and property were withheld under 50 P.S. § 4424 or applied to their maintenance under 50 P.S. § 4501 since July 11, 1974, and, in addition, the amounts withheld or applied to maintenance for each such patient or former patient. The Defendant Beal shall obtain and forward these reports to the Court and all plaintiffs' counsel within sixty (60) days of this Order.

4. Within ninety (90) days of this Order, Defendant Beal shall assure that all such amounts withheld under 50 P.S. § 4424 shall be accounted for and that all such amounts applied to maintenance under 50 P.S. § 4501 shall be paid back to the patients or former patients, including interest earned. Such payment shall be accompanied by a full statement of account to all such patients and former patients. Within one hundred (100) days of this Order, Defendant Beal, and his counsel, Marx Leopold, shall file with this Court and all plaintiffs' counsel a statement certifying under oath the names, addresses, amounts withheld or applied to maintenance and amounts paid back to each former or present patient.

5. Plaintiff Walter Buress' uncontested motion to intervene is hereby granted and Defendant Beal shall arrange for payment to Walter Buress of the full sum wrongfully withheld from him since July 11, 1974, such payment to be made within ten (10) days. Within fifteen (15) days, Defendants Beal, and his counsel, Marx Leopold, shall certify to this Court under oath that such payment has taken place.

6. The failure to accomplish any of the above acts by the time specified, or the

failure to file required certification with the Court, shall be considered Contempt of this Court and will, after hearing, subject contemnors to fine or other appropriate sanction. The Court shall retain jurisdiction of this matter until the parties shall have fully complied with the terms of this Order.

Exhibit A, attached to the consent order, was a comprehensive set of regulations to be adopted by the Pennsylvania Department of Public Welfare as a means of implementing the original decree. They were personally approved by defendant Beal, Secretary of Welfare, and approved as to legality by the Pennsylvania Department of Justice. They were then duly promulgated in the Pennsylvania Bulletin on April 19, 1975.[3] A certification of the publication was, in accordance with paragraph 1 of the consent order, filed with the Court. The certification also disclosed that repayments had been made to Vecchione and Buress, the named plaintiffs.

Under paragraph 4 of the consent decree the defendants were obliged to account for sums wrongfully taken in violation of the original decree and to have those sums repaid within ninety days. The accounting produced the startling information that the Commonwealth had helped itself to 9.1 million dollars. It soon became clear that despite the decree the fiscal agents of the Commonwealth had no intention of returning the money. On July 9, 1975, six days after the money should have been repaid, under the terms of the consent order, the defendants filed in the district court the first of a series of proceedings, a petition for extension of time and a petition for clarification. These petitions were signed "Marx S. Leopold, General Counsel, Department of Public Welfare." The attorneys for the class responded with a motion for civil and criminal contempt, pursuant to paragraph 6 of the consent order. On September 8 and November 13, 1975, the district court held pretrial conferences on the contempt motion.[4] These were the first of many efforts by the extraordinarily patient District Court to encourage compliance and thereby avoid the necessity of imposing sanctions on the defiant officials.

A new complication was introduced in the enforcement picture when on December 30, 1975, the Honorable Alexander F. Barbieri, Pennsylvania Court Administrator, informed the Attorney General of Pennsylvania that he was advising the Pennsylvania courts not to entertain the proceedings which were specified in Exhibit A to the consent decree and which had been duly promulgated as Regulations of the Department of Public Welfare. Judge Barbieri's letter, quoted in the margin,[5] took the posi-

---

**3.** Mr. Leopold testified that the Pennsylvania Legislative Reference Bureau would not accept for publication a document such as the proposed regulations without a cover sheet signed by a specifically designated member of the Justice Department.

**4.** Apparently as a result of these pretrial conferences monies were transferred out of general appropriations to a segregated account identified by patient name and amount due under the consent decree. (270a).

**5.** Dear Attorney General Kane:

\* \* \* \* \* \*

Your letter of December 17, 1975 again raises the question of the responsibility of the Pennsylvania judicial system to conduct an estimated 9,000 individual hearings under the directives of the Opinion and Order in Vecchione v. Wohlgemuth. My examination of the circumstances involving residents in the class envisioned in Vecchione suggests that safeguards sought could be adequately found for most residents in present or revised auditing procedures rather than by an individual due process hearing in every case. Furthermore, neither any of the courts, nor this Office under my authority as Court Administrator of Pennsylvania, has been named as a party originally, or subsequently joined as a necessary party to the Vecchione matter, in order to provide for the Judiciary of Pennsylvania an opportunity to present its views as to the merits of plaintiff's arguments and as to the potential hearing burden that has been placed on an already overtaxed judicial system. Consequently, without such an opportunity to be heard, the Pennsylvania courts are unwilling to accept such an unforeseeable and ex parte hearing responsibility imposed by the Federal Court.

We can appreciate your desire to move forward with filing the required petitions, but must decline to entertain the processing of such petitions. Our court systems simply lack the manpower, the facilities, and the money to undertake such an enormous hearing responsi-

tion that the judicial system of Pennsylvania had no duty to abide by an order arising from proceedings to which it was not a party, and concluded:

> Without wishing to appear presumptuous it would appear that a petition in *Vecchione* by your Office to reconsider and revise might be in order.

Whether or not the Attorney General considered the advice to be "presumptuous," he decided to act on it. On February 12, 1976, he filed a Rule 60(b) motion to vacate or modify the consent decree of April 4, 1975. The motion was not addressed to the original final judgment of June 11, 1974. Indeed the Commonwealth conceded, in paragraph 19(219a), that the court's litigated decision on the unconstitutionality of §§ 424 and 501 was not merely final, but correct. It advanced three reasons for vacating the contempt proceeding consent decree:

1. That Marx Leopold and Cecil Maidman were not authorized to consent to it.
2. That no one other than the state legislature was authorized to waive the Commonwealth's Eleventh Amendment immunity, and the Commonwealth intended to keep the 9.1 million dollars.
3. That the parties to the contempt proceeding misunderstood the status of the state officer, who in taking the checks, was not acting pursuant to the challenged Pennsylvania statutes, but pursuant to the Federal Social Security Act.

■ Turning to the first reason for vacating the consent decree, we note at the outset that the Deputy Attorneys General presently appearing in place of Marx Leopold and Cecil Maidman did not contend before the district court, and do not contend here, that Leopold and Maidman either lacked authority to appear in the action for the individual defendant state officers, or that they lacked authority from those individual defendants to consent to the decree and thereby avoid sanctions. Moreover, neither in the district court nor in this court do the Deputy Attorneys General handling the case contend that the authority of the actual defendants, as distinguished from their attorneys Leopold and Maidman, was exceeded in agreeing to the consent decree. Since the suit was brought against the individual defendants on the authority of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), an inquiry into the authority of Leopold and Maidman with respect to the Commonwealth would seem to be beside the point. They apparently were authorized by the defendants for whom they appeared in the contempt proceeding. The state does not allege that those defendants lacked authority to settle the contempt proceeding by arranging to purge themselves of their prior disobedience of a concededly valid judgment.

bility. Further, despite our discussions with you about the possibility of promulgating a new Supreme Court rule authorizing appointment of masters to conduct the mandated hearings, no such rule has been or will be promulgated because we lack the financial resources to fund such a mastership system.

Furthermore, the Pennsylvania Judiciary plans to seek intervention in the case of *Kremens v. Bartley*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184, now on appeal by your Office to the United States Supreme Court, wherein a ruling will be sought on the questions of (a) whether the Pennsylvania court systems without being joined and without an opportunity to be heard, may be called upon in a District Court Order to comply with an overwhelming judicial hearing responsibility, and (b) whether or not the District Court should abstain pending State Court proceedings on issues such as those presented in *Vecchione* and *Kremens.*

Accordingly, this Office will have no alternative but to advise the trial courts of Pennsylvania to hold in abeyance any petitions which may be filed pursuant to the *Vecchione* decree until the United States Supreme Court has provided guidance by its determination in *Kremens.* It is our legal contention that the judicial system has no duty to abide by an Order arising from proceedings to which it was not a party.

Without wishing to appear presumptuous, it would appear that a petition in *Vecchione* by your Office to reconsider and revise might be in order.

Very truly yours,
Alexander F. Barbieri
Court Administrator of Pennsylvania

We recognize that for eleventh amendment purposes the *Ex parte Young* type suit is a legal fiction, and that as a practical matter the original injunction did bind the Commonwealth. Indeed, the appellants do not contend that the Commonwealth is not bound by the judgment. Instead, they take the position that having disregarded its provisions they, as individual defendants in a contempt proceeding, can accept the benefit of counsel furnished by the Commonwealth, authorize such counsel to appear for them and negotiate a consent decree to avoid sanctions, and later assert that they can have the consent decree set aside, because although they authorized it and partly complied with it their attorneys lacked authority from a nonparty, the Commonwealth. Between the individual defendants and the district court the issue was not counsels' authority to act for the Commonwealth, but the defendants' responsibility to obey the court's judgment. As paragraph 6 of the consent order makes clear, the district court was not concerned with the defendants' authority either. That paragraph indicates that if they failed to make restitution they would be in contempt. Where the money came from to comply with the restitution ordered in paragraph 4 of the order was their problem, not the court's.

The appellants would have us hold that for purposes of the authority of Leopold and Maidman, the contempt proceeding was actually against the Commonwealth, while for purposes of the eleventh amendment the long participation of those attorneys in the suit was not a waiver of the Commonwealth's immunity. Even if we accept the proposition that Leopold and Maidman were appearing not for the actual contemnors but for the Commonwealth, the contention that they lacked authority to consent to the April 15, 1975 order is not persuasive. The uncontradicted testimony of Mr. Leopold is that he had specific authority from J. Shane Creamer, Attorney General, to handle the Vecchione litigation on behalf of the Department of Welfare. According to the testimony, no limitation on that authority was communicated to him or to his clients in that Department. When

the contempt proceedings began, Leopold discussed it with defendant Frank Beal, Secretary of Welfare, who authorized him to attempt to negotiate a resolution which would avoid a contempt hearing. Leopold understood, based on his prior authorization from the Attorney General and the way the office was conducted, that he had authority to try to resolve the motion for contempt in some amicable way. He had in the past, as general counsel to the Department of Public Welfare, signed various stipulations and consents which resulted in substantial amounts of money being expended by the Commonwealth or an agency.

The Department of Justice, of which the Attorney General is the head, has authority "[t]o furnish legal advice to . . . officers of the State Government, concerning any matter or thing arising in connection with the exercise of the official powers or the performance of the official duties of . . . such . . . officers," 71 P.S. § 292(a), and "[t]o supervise, direct and control the legal business of every administrative department . . . of the State Government." 71 P.S. § 292(b). It also has the power and duty "[t]o represent any . . . officer . . . in any litigation to which the Commonwealth or such . . . officer may be a party . . ." 71 P.S. § 293(b). Section 292(b) implies that the Department of Justice has the exclusive power to compromise and settle lawsuits against the Commonwealth. *See Commonwealth, Dept. of Public Welfare v. UEC, Inc.,* 19 Pa.Cmwlth. 461, 338 A.2d 730 (1975). This suit, however, was not against the Commonwealth, but against the officers personally. The Commonwealth has not, in any statute which has been called to our attention, prohibited individual defendants, sued for violations of the federal constitution, from taking steps to protect themselves from individual liability by bringing to an end their offending conduct. We need not in this case consider whether as a matter of due process the Commonwealth could do so.

The Attorney General, recognizing that his department does have authority to enter

into stipulations and consent decrees, urges that by regulation he has limited the authority of the Commonwealth attorneys acting under his supervision. Regulations adopted June 7, 1974, 4 Pa.B. 1145, 37 Pa. § 141.51–52 provide:

§ 141.51 Scope

*The procedure set forth in § 141.52 of this Title* (relating to stipulations or consent decrees covered) *are established for review and approval of settlement of suits for injunctive relief* against the Commonwealth. Such settlements include stipulations between the parties, stipulations with the approval of the court or consent decree.

§ 141.52 Stipulation or consent decrees covered.

The following stipulations or consent decrees shall be approved before execution by the Attorney General, or in his absence, by the First Deputy Attorney General:

(1) if it is agreed, conceded, or stipulated that a provision of the Pennsylvania Constitution, a state statute or a state regulation of statewide effect is unconstitutional;

(2) if the effect of any stipulation or decree shall result in expenditures by the State, either in administrative costs or direct payments to beneficiaries of the stipulation or decree, in excess of $1,000,-000 or

(3) if the relief granted through stipulation or decree is unique, unusual, or such that it would be uncertain that a court would order such relief should plaintiff win on the merits.

(emphasis added)

The regulations do not apply, of course, to the litigated decree, which finally determined the Commonwealth's obligation to refrain from taking inmate social security checks without due process. Moreover, it is at least questionable whether § 141.52(2) literally applies to the obligation to return inmate funds unlawfully appropriated. Those funds are not "administrative costs or direct payments to beneficiaries." They are the property of the inmate. And in any event, the obligation to restore the funds rests on the individual contemnors. What steps they must take to obtain such restoration is a matter between them and the Commonwealth, not between the district court and the Commonwealth. Whatever limitation the Attorney General has placed upon his deputies respecting stipulation or settlement in suits directly against the Commonwealth, that limitation is not in terms applicable when the Attorney General undertakes the representation of individual defendants in an *Ex parte Young* type suit.

In addition, there is the question of the Attorney General's authority under state law to adopt the quoted regulation. No Pennsylvania statute confers rulemaking authority on the Attorney General. Pennsylvania follows the general rule of administrative law that where there has been no express grant of rulemaking authority, a rule pronouncement serves as a statutory interpretation and is not binding on a court. *Pennsylvania Human Relations Comm'n v. Uniontown Area School District,* 455 Pa. 52, 76, 313 A.2d 156, 169 (Pa.1973); *Pennsylvania Human Relations Comm'n v. Norristown Area School Dist.,* 20 Pa.Cmwlth. 555, 342 A.2d 464, 467 (1975). We are not informed what statute the regulations purport to interpret; perhaps 71 P.S. § 293(b). But it seems to us that one cannot interpret a statute authorizing the Attorney General to represent officers sued as individual defendants to be a grant of authority to prevent them from settling other than on his terms. The defendant officers, not the Attorney General, are facing the prospect of coercive incarceration or other sanctions.

Finally, it seems to us that the question of scope of authority of an attorney appearing and litigating in a forum must, ultimately, be a question of the law of that forum, federal or state. In this contempt proceeding in a federal forum, for the vindication of an unchallenged final federal judgment we have no hesitation in saying that Leopold and Maidman had authority not only to appear and defend on behalf of the individual defendants, but also to nego-

tiate a settlement on their behalf and to consent to the April 4, 1975 order. That authority was amply confirmed when the Department of Justice approved the adoption and promulgation of the regulations provided for in paragraph 1 of the order, when the defendants repaid the funds belonging to plaintiffs Vecchione and Buress, and when the Secretary of Welfare took other steps to implement the decree. No suggestion of any lack of authority in the attorneys appearing for the contemnors was made from April 4, 1975 until February 12, 1976. Clearly the lack of authority contention is a mere afterthought which cannot be entertained by any forum charged with the responsibility of discharging its judicial business with finality.

■ We turn, then, to the appellants' eleventh amendment argument. That argument is predicated upon *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which held that *Ex parte Young* did not authorize a decree requiring the payment of past benefits out of the state treasury. But *Edelman v. Jordan* quite explicitly left intact the authority of federal courts to enter prospective decrees having fiscal consequences to a state treasury as the necessary result of compliance. 415 U.S. at 667–68, 94 S.Ct. 1347. Thus, as appellants concede, the original litigated decree was and remains unchallengeable. What they seek to draw from *Edelman v. Jordan*, then, is the proposition that while the original judgment prohibiting the appropriation of patient funds without a hearing was perfectly valid under *Ex parte Young*, they were free to disregard it with impunity and could, when challenged, plead that by paying over the misappropriated funds to the state they obtain the protection of the eleventh amendment.

A necessary corollary to such a proposition, of course, is that the original decree was a mere advisory opinion, subject to effective revision by the unilateral action of the defendants. But federal court injunc-

tions against state officials who violate federally protected rights are not, despite slogans like "comity, equity and federalism," mere precatory admonitions. *See Mayberry v. Maroney*, 529 F.2d 332, 335 (3d Cir. 1976). They are enforceable by coercive contempt proceedings, which act upon the persons of the defendants. Indeed, *Ex parte Young* was before the Supreme Court on habeas corpus after an adjudication that Attorney General Young was in contempt of such an injunction.[6] Similarly, the April 14, 1975 consent order acted upon the persons of the defendants, and did not, in our view, implicate the eleventh amendment. It is true that as a practical matter the defendants could not purge themselves of contempt unless the Commonwealth fiscal authorities cooperated by returning the property of the hospital inmates. But *Edelman v. Jordan* and *Ex parte Young* cannot coexist if the former permits the effective defiance of a decree authorized by the latter. The power to remedy contempt must remain.

■ Moreover, looking upon the contempt proceeding as one directly against the Commonwealth, and paragraph 4 of the April 4, 1975 order as one directly binding on it rather than on the persons of the defendants, the Commonwealth must be held to have waived its eleventh amendment immunity from federal civil process by appearance.

It is well established that the defense of sovereign immunity from suit in a federal court may be waived. E. g., *Missouri v. Fiske*, 290 U.S. 18, 24, 54 S.Ct. 18, 78 L.Ed. 145 (1933). A general appearance in litigation in a federal court may be such a waiver. *Clark v. Barnard*, 108 U.S. 436, 447–448, 2 S.Ct. 878, 27 L.Ed. 780 (1883).

*Skehan v. Board of Trustees*, 501 F.2d 31, 41 (3d Cir.); *vacated on other grounds*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 *on remand* 538 F.2d 53 (3d Cir. 1976). *Edelman v. Jordan, supra*, recognized that the eleventh amendment defense could be as-

---

6. Cf. *United States v. United Mine Workers*, 330 U.S. 258, 289–95, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

serted for the first time on appeal. But in this case neither the original judgment nor the consent decree in the contempt proceeding was appealed. Neither order was void. If, as the cases indicate, eleventh amendment immunity from suit in a federal court may be waived, that waiver must be deemed to have become final at the latest when the resulting judgment has become final. Otherwise a judgment in a suit in which the state appears and litigates would, as we said with respect to the suit against the officers, be a mere advisory opinion.[7] Here the eleventh amendment contention was not made until almost a year after the time for appeal from the April 4, 1975 order had expired.

Our conclusion that the April 4, 1975 decree was a valid and effectual judgment brings us to the appellants' last point, that the district court erred in denying their Rule 60(b) motion for relief from it. As we said in *Mayberry v. Maroney, supra*, 529 F.2d at 335 (Commonwealth officers ignored the provisions of a federal court judgment), Rule 60(b)

> provides for extraordinary relief and may only be invoked upon a showing of exceptional circumstances.

Of the six grounds listed in the rule, only (1) mistake, inadvertence, surprise or excusable neglect; (4) the judgment is void, or (6) any other reason justifying relief from the operation of the judgment are arguably relevant. We have held that the judgment is not void. The appellants' argument that there was a "mistake" (in that the defendants, though they thought they were taking the checks as state officers, were really acting under the Social Security Act), is frivolous. Their status as state officers acting under the challenged Pennsylvania statutes was established by the initial litigated decree, which they do not even now contest. Moreover the district court, in the hearing on the Rule 60(b) motion, found that the state fiscal officers continued to act pursuant to the challenged state statutes. We can add nothing to the district court's treatment of the contention about the Social Security Act except our endorsement of it. As to "other reasons," none are advanced except the unwillingness of the Commonwealth to return the 9.1 million dollars and the unwillingness of the Pennsylvania courts to entertain proceedings which would meet due process standards. These are unpersuasive reasons, especially viewed in light of the absence of a challenge to the judgment establishing both that the present Pennsylvania statutory proceedings violate due process and that the 9.1 million should not have been taken pursuant to those procedures.

The most striking omission from the appellants' argument for relief from the April 4, 1975 order is any suggestion as to an appropriate disposition of the underlying contempt proceeding if it is vacated. The only appropriate disposition, if the order were to be vacated, would be to proceed with the contempt and sanctioning of the contemnors until the harm flowing to the plaintiff class from their disobedience of the original judgment was remedied. That is already provided for in paragraph 6 of the consent order. In these circumstances the district court did not abuse its discretion in denying appellants' Rule 60(b) motion.

The judgment appealed from will be affirmed.

---

**7.** Thus we disagree with the holding in *Jordon v. Gilligan*, 500 F.2d 701 (6th Cir. 1974) that a claim of sovereign immunity can be raised by a Rule 60(b)(4) motion at any time. Cf. *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940);

*United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); Boskey & Braucher, Jurisdiction and Collateral Attack, 40 Colum.L.Rev. 1006 (1940).