Elvira VECCHIONE, Plaintiff,

v.

Helene WOHLGEMUTH et al.,
Defendants.

Walter BURESS, Individually and on
behalf of all others similarly situated,
Plaintiff–Intervenor,

v.

Frank BEAL et al., Defendants.

Civ. A. No. 73–162.

United States District Court,
E. D. Pennsylvania.

Jan. 13, 1977.

Judy Greenwood, Jonathan M. Stein, Philadelphia, Pa., for plaintiff.

David Ferleger, Philadelphia, Pa., for plaintiff-intervenor.

Allen C. Warshaw and Norman J. Watkins, Deputy Attorneys General, Harrisburg, Pa., for defendant.

Before HUNTER, Circuit Judge, and TROUTMAN and BECKER, District Judges.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

On July 11, 1974, we filed a three-judge court opinion in this 42 U.S.C. § 1983 case which deals with the right of patients confined in state mental hospitals in Pennsylvania to control and manage their own property as against: (1) the right of the Commonwealth to summarily seize and control it for the duration of the hospitalization, without prior notice or hearing on the issue of the patient's competency to control that property; and (2) the right of the Commonwealth to appropriate part of the patient's property in satisfaction of the cost of care and maintenance without prior or subsequent hearing on the correctness of the Commonwealth's assessment. 377 F.Supp. 1361, 1362 (E.D.Pa.1974). The "bottom line" of that opinion was a declaration that § 424 of the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4424, read in conjunction with § 501 of that Act, 50 P.S. § 4501, offended the equal protection and due process clauses of the Fourteenth Amendment. We issued an injunction (hereinafter "original decree") against the further application of section 424. No appeal was taken.

We were aware when we filed our opinion that compliance with the original decree required major changes in the manner of handling the funds of mental patients in Pennsylvania institutions and that implementation could not be accomplished overnight.[1] We could not have anticipated, however, that almost two-and-one-half years after the original decree we would be filing the present opinion deciding motions interposed by state officials attacking its validity on the grounds that we had adjudicated a case not before us, and that we thus lacked subject matter jurisdiction. Nor could we have perceived that the case would proceed to the point where the Commonwealth would attempt to repudiate the instrument finally devised for implementing the original decree a consent decree entered on April 4, 1975, (hereinafter "consent decree"), on the grounds that the general counsel for the Pennsylvania Department of Welfare who signed the consent

---

1. We elected not to hold a further hearing for the purpose of prescribing the steps for implementation of the original decree, deeming it appropriate for the responsible state officials, within the constraints of the decree, to do so.

decree and submitted it to the Court was unauthorized to do so.

An understanding of the present motions requires a brief description of the interim history of the case. After our July 11, 1974 decision we heard nothing until early 1975 when counsel for plaintiff and an intervening plaintiff [2] moved that the defendants, including Secretary of Welfare Frank S. Beal, be adjudged in contempt for failure to comply with the original decree. There followed a period of negotiation, pursuant to which the parties entered into a stipulation for the consent decree. The consent decree incorporated comprehensive regulations to be adopted by the Pennsylvania Department of Public Welfare as a means of implementing the original decree. The stipulation included provisions for repayment to mental patients of sums withheld pursuant to the statutory procedure which we invalidated. The stipulation was signed on the Commonwealth's behalf by Assistant Attorney General Marx S. Leopold who was General Counsel for the State Department of Welfare, and by Assistant Attorney General Cecil Maidman who, along with Leopold, had conducted the litigation on the defendants' behalf before the three-judge court. The consent decree was approved by the undersigned on April 4, 1975. The regulations were personally approved by defendant Frank S. Beal, Secretary of Welfare, and approved as to legality by the Pennsylvania Department of Justice. They were published in the *Pennsylvania Bulletin* on April 19, 1975, and certification of publication was filed with the Court.

The consent decree did not end the undersigned's involvement in the matter, for notwithstanding the new regulations it appeared that the problems involved in implementation could benefit from the mediation efforts of the Court, and we embarked upon a series of implementation conferences.[3] *First,* the problems of obtaining suitable guardians for the small funds involved (most banks were uninterested) were not inconsiderable, and a dispute arose between counsel as to the appropriate means of handling the matter. In the many implementation conferences, a variety of options were explored.[4] *Second,* the processing of the many Guardian Petitions required by the two *Vecchione* decrees met with resistance from the State Court system which contended that it was understaffed and ill-equipped to handle the enormous volume of necessary petitions.[5] However, through mediation, we were able to stave off a constitutional confrontation among the State and Federal Courts (see n. 5) and the State Attorney General, who with the cooperation of the State Court Administrator is now moving ahead with the processing of the *Vecchione* guardian petitions. *Third,* there arose a dispute between counsel as to the Welfare Department's procedure for preliminary determinations of competency pursuant to the consent decree, and we mediated that as well.

The biggest problem, however, did not involve any of the foregoing, but was, as is so often the case, a matter of money. At one of our implementation conferences it appeared that the Commonwealth had withheld from mental patients after the original

2. The intervening plaintiff was Walter Buress, a patient at Farview State Hospital. Mr. Buress is represented by David Ferleger, Esquire. The original plaintiff is represented by Judy Greenwood, Esquire.

3. We took the position, and counsel concurred, that matters of implementation of a three-judge court decree were for the single (assigned) judge, who was Judge Becker.

4. We discussed, *inter alia,* the creation of an office of guardians within the Governor's office, free from the Revenue Departments' conflict of interest and the Welfare Department's

omnibus aegis. Pursuant to an Interim (implementation) Order adopted May 26, 1976, the former role of State Revenue Department Agents in handling patients' funds has been assumed by (public) guardians in the Welfare Department.

5. On December 30, 1975, the State Court Administrator, Judge Alexander F. Barbieri, wrote to Attorney General Robert Kane that, because the State Court system had not had an opportunity to be heard in the *Vecchione* case, the State Court Judges would refuse to entertain *Vecchione* guardian petitions.

decree some 9.1 million dollars which it was bound to repay by the terms of the consent decree; *i. e.,* notwithstanding the original decree the revenue agents had continued to seize and appropriate patients' money up until April 4, 1975 with the result that virtually all of it was returned by the revenue agents to the State Treasury general fund in payment of care and maintenance. The Commonwealth was unable at the time to free up the funds for repayment.[6] Moreover, the Commonwealth began to contend that the repayment of such sums would violate the Eleventh Amendment to the Constitution and that the consent decree was signed by Assistant Attorneys General who lacked power or authorization. Additionally, the Commonwealth began to question the viability of the original decree by asserting that counsel in presenting the case had failed to inform the court that Mrs. Vecchione's funds, and the vast bulk of the funds held by Revenue Department Agents (hence affected by the original decree) were funds received from the Social Security Administration (or other federal agencies such as the Railroad Retirement Board) which the Pennsylvania Revenue Department Agents were holding, not subject to section 424, but pursuant to representative payee procedures established by agreement with the Social Security Administration (or other agency). As Mr. Leopold put it in a "Petition for Clarification" filed on July 10, 1975, the Court and plaintiffs and defendants "apparently assumed" that the funds at issue were section 424 funds but they (allegedly) were not.

Further implementation conferences with the undersigned continued.[7] The Commonwealth had designated Deputy Attorney General Donald Murphy, a high level Justice Department official, to act as the Commonwealth's representative, and Mr. Murphy attended the various conferences along with Joseph Kennedy, Esquire, Chief of the Revenue Department's Bureau of Institutional Collections, Paul Carey, the new General Counsel for the Welfare Department, and representatives of the Social Security Administration, including a regional representative, Mr. Thomas L. Toole, and an HEW attorney Larry Bailine. Notwithstanding the allegations of the "Petition for Clarification," the Commonwealth represented at these conferences that the monies in question would be repaid;[8] moreover, Mr. Toole represented that the Social Security Administration would abide by the *Vecchione* decree.

We heard nothing for some time and had thought that the problems were solved. However, on February 18, 1976, the Commonwealth defendants filed a Motion to Vacate and/or Modify the Consent Decree. At conferences following the filing of the motion the Commonwealth attorneys first took the position that they attacked only the consent decree, not the original decree. In due course, however, it appeared that they were attacking both. Because it appeared that resolution of the issues posed by the Commonwealth's motion might take some time, we continued our implementation conferences, and worked out two Interim (Implementation) Orders, dated May 26,

---

**6.** The payback question relates only to pre-April 1975 funds.

**7.** In view of the role of the implementation conferences in the case, we have docketed, in a single file, the correspondence during that period.

**8.** Ultimately the Commonwealth obtained the $9.1 million from the treasury and repaid it to the account of the revenue agents who paid back somewhere between $1.5 and $2 million to patients. Obviously the sums paid to patients were in turn subject to payback for care and maintenance though to date the Commonwealth says that it has collected back less than 50% of the amount due. The remaining funds

are likewise subject, upon payback, to liability for care and maintenance subject of course also to such defenses as the patient may interpose. *See Vecchione,* 377 F.Supp. at 1365–66. In due course the Commonwealth should recoup the vast bulk of the funds. But the point of the original opinion and decree of course was the *method* by which the Commonwealth received its maintenance and care charges—*i. e.,* not by seizure and appropriation but by payment of the funds to patients competent to handle them or to statutory guardians with reimbursement for care and maintenance via (conventional) billing of the responsible party.

1976. The Commonwealth agreed to advance implementation, because it has at all times stated that it agrees with the principles of the July 11, 1974 *Vecchione* opinion, except those sequellae which it is litigating.

The motion to vacate and/or modify is founded upon Fed.R.Civ.P. 60(b). *Inter alia,* it raises those questions about subject matter jurisdiction, the Eleventh Amendment, and the validity of the consent decree to which we have already referred. The plaintiffs filed an answer, not only countering the allegations of the motion, but also suggesting with considerable force that what the defendants were attempting to do was to relitigate a two-year old decree.

A briefing schedule was established, depositions were taken, and on September 30, 1976, a hearing on the motion was held before the three-judge court. The hearing consisted mainly of legal argument: the evidentiary foundation was supplied by a stipulation based upon the various depositions. There was, however, one factual development of note: counsel for the defendants (who, everyone seemed to agree, were authorized Commonwealth representatives) agreed that Messrs. Leopold and Maidman were authorized *to represent* the Commonwealth defendants in the initial three-judge court proceeding and that the defendants were bound by the stipulations which they had made therein. These included stipulations which establish that the funds of the plaintiff Mrs. Vecchione which came from Social Security payments were held by the Revenue Agent pursuant to section 424.

On October 8, 1976, the undersigned, acting on behalf of the three-judge court, entered an order denying the motion to vacate and/or modify with the notation that our opinion (explaining the decision) would follow. This is that opinion. Inasmuch as the defendants have filed a notice of appeal to the United States Court of Appeals for the Third Circuit, and the record has been transmitted to that Court, this opinion will be transmitted as a (certified) supplement to the record.

The defendants have also moved pending appeal for a stay. Because it is an anomalous motion we rescribe its prayer:

Defendants respectfully move this Court for an Order staying the operation of this Court's Order of October 8, 1976, denying Defendants' Motion to Vacate and/or Modify. By this Motion defendants seek to stay the requirements of the Order of April 4, 1975, and reinstate the terms of this Court's two Interim Orders of May 26, 1976, pending determination of the appeal in this case.

We do not perceive that there is any such thing as a Motion to Stay an Order denying a Motion to Vacate and/or Modify an earlier unappealed-from decree. To the extent such a motion could exist, we fail to perceive how it could do anything but cause a reversion to the status quo ante, *i. e.,* the unenforced but unappealed-from July 11, 1974 decree and/or the April 4, 1975 consent decree. Nor do we believe that the interim orders can alter this view, for those orders were on their face only a device to advance implementation while the defendants were litigating the motion to vacate and/or modify. Furthermore, the standards for a stay pending appeal have not been met. In this regard we note principally that we find no likelihood of success on the merits and that the grant of a stay, if it were possible, would cause irreparable harm to many of the institutionalized mental patients in Pennsylvania. In view of both of the foregoing factors, the harm which would certainly result to those institutionalized patients outweighs the claimed risk of harm to defendants. Further, we believe that the grant of a stay would be contrary to the public interest. For these reasons and those set forth in this opinion the motion for a stay has been (by an Order filed December 14, 1976) denied.

II. *The Subject Matter Jurisdiction Issue*

A. *Case or Controversy Claim*

One portion of defendants' motion, based upon Fed.R.Civ.P. 60(b)(4), asserts that the consent decree was a void judgment. And in their Reply Memorandum

the defendants have conceded that their rule 60(b)(4) attack upon the consent decree is derivatively an attack upon the validity of the original decree, which they regard as having issued mistakenly in the absence of a case or controversy as required by Article III of the Constitution. Defendants claim that the supremacy clause requires that federal law,[9] as opposed to the state law which was adjudged unconstitutional in our decree,[10] be deemed to govern the handling of the plaintiff's social security payments. Those payments were the only personal property which Mrs. Vecchione possessed or received at the time of the 1974 litigation. Defendants also claim that state revenue agents, to the extent they were acting as representative payees of social security benefits, were in practice disregarding the terms of sections 424 and 501. Because the state statutes were not being applied to the plaintiff, defendants maintain, this court was without jurisdiction to decide the case or approve the consent decree.

Although technically no motion to vacate the 1974 judgment has been presented, for the purposes of this phase of the court's opinion we will conform our analysis to defendants' contentions and will consider defendants' claim that the 1974 judgment was void in light of the factual record developed in connection with this motion. This will involve an analysis of the requirements of the Social Security Act and its regulations and a factual inquiry into the activities of state revenue agents who also served as the representative payees of social security benefits.

First of all, we believe that the defendants' theory of the operation of the supremacy clause cannot withstand close ex-amination. Section 424(1) itself provides in plain terms that the authorized state revenue agent

> shall . . . take custody of, receive and manage in accordance with this section . . . *any other benefits or payments* to which such person covered by the provisions of this act may be entitled. [Emphasis supplied.]

On its face, 424 therefore requires a state revenue agent to comply with its terms in handling social security benefits. Obviously, this does not mean that the state may compel the Social Security Administration (SSA) to appoint the state revenue agent as its representative payee. Nonetheless, when the SSA chooses to make a state revenue agent the recipient of a patient's social security benefits it is within a state's power to require simply that the agent should still act in accordance with his state legislative directives. We believe this to be the reasonable interpretation of 424 in this setting. There is positively nothing in the Social Security Act or the SSA regulations which requires Pennsylvania to offer its revenue agents for unconditional service as representative payees.

■ We do not, of course, dispute the general proposition that federal law supersedes inconsistent state law. The flaw in the defendants' supremacy argument, however, is their seeming presumption that the operation of any federal law at all on the subject of the appointment of a payee is automatically and necessarily exclusive.[11] It is common knowledge that the administration of the Social Security Program in many respects depends upon federal and state cooperation, and it should not be surprising that the Commonwealth would be

---

**9.** The defendants contend that the operative law is to be found in 42 U.S.C. § 405(j)(1970) and 20 C.F.R. § 404.1601 *et seq.* These are quoted in the Appendix at pp. 28–30.

**10.** 50 P.S. §§ 4424, 4501 (1969). These sections, hereinafter referred to as 424 and 501, are quoted in the Appendix at pp. 31–32.

**11.** We are aware of the usual operation of the supremacy clause in the context of the Social Security Act, 42 U.S.C. § 301 *et seq.* (1970). *See, e. g., Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). The present case is different in that the federal standards do not at all require the state revenue agents to serve as representative payees. The SSA may or may not appoint these agents, and would do so in any event only after its own evaluation of the capacity of those agents to meet SSA requirements.

entrusted in any given instance to act according to its own procedures. It is our view that when the SSA chose to make the state revenue agent its representative payee, it did so in the belief that the state scheme satisfied the requirements of the federal regulations.[12] Contrary to defendants' assertions, this interpretation does not imply that the SSA forfeited the right to hold the agent accountable to it for any possible misappropriation.

■ The federal regulations and the federal statute are on their face consistent with 424 in all details but possibly one.[13] The SSA regulations provide that the SSA shall make its own determination of a patient's competency.[14] Defendants observe that at the point a patient's personal assets exceeded $2,500 he or she would be entitled to an adjudication of competency under 424(4) and to the appointment of a guardian in the event he or she was declared incompetent. Defendants then conclude, how-ever, that the federal regulations make the SSA's decision on competency the legally operative one for purposes of appointing a representative payee, thereupon suggesting that the federal law should prevail and that the revenue agent must continue to receive payments regardless of the appointment of a guardian for state purposes. This conclusion fails to recognize that the revenue agent, upon receiving an appointment as the payee of the SSA, would not be absolutely and permanently bound to continue in that capacity. In the event a state guardian were appointed, the revenue agent's duties as payee could simply terminate leaving the SSA to accept the guardian as its representative payee or look elsewhere.

■ In considering the evidence advanced in connection with the present motion, we believe that social security benefits paid to revenue agents were in fact administered in accordance with 424. Even de-

12. That such a flexible, cooperative relationship existed between the SSA and the Commonwealth is illustrated by the response of the SSA to this court's 1974 decision and 1975 consent decree. Letter from SSA Regional Representative Edmund J. Sabatini to Honorable Edward R. Becker, August 6, 1975:

Dear Judge Becker:
As requested in the meeting of August 4, 1975, in your office, regarding the above case, you are advised that this confirms the position of the Department of Health, Education, and Welfare, Social Security Administration as stated by Thomas L. Toole, Assistant Regional Representative (Program), Mid-Atlantic Program Center, Philadelphia, Pennsylvania, in that when a Social Security beneficiary enters a Pennsylvania mental institution benefits will be continued to him pending a decision as to his competency. If the Commonwealth's preliminary decision is that he is competent we will continue to pay him direct. If the preliminary decision is that he is incompetent the Social Security Administration will ascertain if there is a spouse or relative who has shown interest in the beneficiary's welfare and will assume the responsibility of a Representative Payee. If so, we will approve that person as Representative Payee. If there is no such qualified person we will continue the payment of benefits to the beneficiary until a legal guardian is appointed and files as Representative Payee. In the transitional cases, we will continue to pay the Revenue Agent, the present payee,

until we receive a preliminary decision as to the beneficiary's competency. If the Commonwealth's decision is that he is competent, we will obtain an application from the beneficiary and pay him direct at the address he designates. If the preliminary decision is that he is incompetent, we will approve the legal guardian as payee as soon as he files an application.
We do not, however, rely upon this letter for our decision.

13. Defendants have also contended, however, that the SSA regulations conflict with the state law procedures on the duty of a representative payee to apply social security payments to the costs of institutional care and maintenance. *See* 20 C.F.R. § 404.1606. They assert that federal law *requires* that the "highest priority" shall be accorded such institutional charges, etc. Defendants then distinguish this federal requirement from state law, which merely allows for such payments. As a practical matter, however, it seems fatuous to suggest that the state law authorization to state revenue agents was not on this point wholly adequate to meet the institutional maintenance requirements of 20 C.F.R. § 404.1606. Once again the clear indication is that the appointment of the state revenue agent as representative payee was based upon the view that his state law duties were wholly sufficient for federal purposes.

14. 20 C.F.R. § 404.1601.

fendants' witness Donald D. Dougherty, the SSA's District Manager in Harrisburg, admitted in his deposition that he knew prior to the 1974 litigation that the state revenue agents who were appointed as representative payees had "concurrent duties" under state law.[15] These duties included an obligation under 424(4) to seek a guardian in the event that a patient's assets exceeded $2,500. Furthermore, it has not even been disputed that the plaintiffs funds were placed into a continuing $100 petty cash account and a $500 reserve account, precisely in the fashion prescribed by 424(2). There is no suggestion whatever that this procedure was required by the SSA regulations or the Social Security Act.[16]

Another factual element of defendants' voidness theory must also be discussed. Counsel for defendants have insisted upon the existence of an "agreement" between SSA and the Commonwealth rendering 424 and 501 inapplicable to the treatment of social security payments by revenue agents. The significance of this asserted long-standing agreement between state and federal administrators would in any event be uncertain because of the broad directive of section 424(1) and because of the evidence set forth above suggesting actual compliance with 424 by revenue agents/representative payees. But in addition to all this, the deposition testimony of Deputy Attorney General Donald J. Murphy, a Justice Department representative during the implementation conferences and a one-time director of the Department of Institutional Collections within the Welfare Department, reveals that there was not even a specifically ascertainable beginning to the "agreement" which was at best no more than an informal understanding. Moreover, Murphy testified: (1) that his successor in the Bureau of Collections who served in that position prior to the 1974 Vecchione litigation expressed his belief that the so-called agreement was defunct and (2) that an SSA district manager indicated in a letter dated December 21, 1972, that there was no operative understanding and that section 424 was to be followed.[17] If these administra-

15. The relevant portion of the deposition of Donald D. Dougherty discussing the duties of revenue agents/representative payees is as follows (Dougherty Deposition at 32–33):

Q. But you knew and you have known at the time you have been appointing the revenue agents that they had *additional responsibilities and concurrent responsibilities* under state law?
A. Yes.
Q. So you knew, for example that the revenue agents under state law had to keep $100 for the patient's personal needs, is that right?
A. Yes.
Q. And you knew that under state law if the person had an estate of more than $2,500 the revenue agent had a responsibility to ask the Department of Justice for appointment of guardian, is that right?
A. Yes.

This testimony, we believe, reinforces our view of the flexible interplay between federal and state law.

16. Defendants' witness Raymond Foote, a revenue agent at Farview State Hospital since 1971, testified on cross-examination that he wrote, in response to a letter asking whether the 424 and 501 procedures were currently being followed in handling entitlements including social security benefits, that such procedures had been followed up to the Vecchione decision. Foote Deposition at 13–16. Further, Mr. Foote was of the opinion as a revenue agent that in handling the plaintiff intervenor's social security payments he had followed the state procedures. Foote Deposition at 16–17. Inasmuch as Mr. Foote should be expected to know what his employment duties are, his opinion that the state law which was described to him was operative is valid evidence that the defendants' theory was not in practice recognized.

17. Donald J. Murphy Deposition at 13–14:

A. . . . *Joe Kennedy, my successor as director of Institutional Collections, called me and indicated to me that he was under the impression the agreement with the Social Security Administration had been, as he put it, discarded.*

I asked him to send me a copy of anything he had to confirm that, and he sent to me what you have attached here as pages two and three of the exhibit, which is *a letter from John Ludwig, district manager of Social Security Administration for the Central Region, to Joe Kennedy as in his capacity as Bureau of Institutional Collections under date of December 21, 1972, and indicating that the so-called understanding used for the past 15 years has been disregarded by the Social Security Administration, and it states the question that follows is what guides do we follow now. The answer would be state law, especially the MH–MR Act, and the guides and procedures that Social Security*

tive officials denied the very existence of an understanding which defendants say must override the limitation on a revenue agent's authority in 424, it should not be surprising that we decline to place any confidence in the defendants' reference to it.

Based upon the record which has been presented to us in connection with the present motion, we believe that the operation of sections 424 and 501 was in fact a live issue in the 1974 *Vecchione* case. We are persuaded to this result, in sum, both because the social security statute and regulations (and any claimed agreement) did not through the supremacy clause forbid a state revenue agent to function under the 424 procedure, and because the evidence demonstrates that responsible officials for the SSA and the Commonwealth themselves recognized that 424, consistently with its plain meaning, should be and was in fact followed even when the revenue agent was serving as a representative payee for social security payments. It may of course be true that the SSA could have been profitably joined as a defendant in the 1974 action. However, because we find that revenue agents/representative payees were operating under state law, there did indeed exist a case or controversy and it was therefore within the Article III jurisdiction of this court to adjudge sections 424 and 501 unconstitutional. To the extent defendants' motion to vacate or modify the 1975 consent decree is construed as a 60(b)(4) motion

asserting the voidness of the 1974 judgment it must thus be denied.[18]

B. *The Availability of 60(b)(4) Relief*

■ Even apart from our finding that the defendants' denial of the plaintiff's standing is incorrect, we find ourselves in disagreement with defendants' position on the availability of 60(b)(4) relief in the circumstances of this case. At one end of the spectrum is the self-explanatory rule that a judgment rendered in the absence of subject-matter jurisdiction is a legal nullity, unable to ripen with age into a valid judgment. *See Misco Leasing, Inc. v. Vaughn,* 450 F.2d 257, 260 (10th Cir. 1971). At the other end is the principle, sometimes referred to as the boostrap principle, that a court possesses the jurisdiction to decide whether it has subject matter jurisdiction. *See, e. g., Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940) (requiring only an opportunity to litigate at the outset the jurisdictional issue); *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); Dobbs, *Beyond Bootstrap: Foreclosing The Issue of Subject Matter Jurisdiction Before Final Judgment,* 51 Minn.L.Rev. 491 (1967) (hereinafter cited as Dobbs); *cf. United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

■ The Supreme Court has not been at all times pellucid in reconciling the above

has adopted nationwide, and the results of the on-site review program.

When I received that I called either John Ludwig or Tom Toole, the Pennsylvania supervisor for the Social Security Administration, and asked him if this meant that the provisions of section 424 of the Mental Health Act were what we were now operating under. And he indicated no. And I indicated that if so, it would appear that the revenue agent would have to be designated representative payee in any case, or in every case, regardless of whether or not there was available a spouse, parent or next friend outside of the institution. He indicated yes, and to the extent that we were still choosing other than the revenue agent, they were operating under the provisions of the Social Security Act and under the vestiges of the agreement.

We observe that Murphy's last remark does not really point to an inconsistency in the view that 424 operates as to all revenue agents who have in fact been appointed as representative payees. Nothing in state law, of course, could force the SSA to make such appointments.

18. There is an independent and equally sufficient ground for sustaining subject matter jurisdiction. The defendants' stipulation to portions of the complaint established that the funds held by the Revenue Agent were held pursuant to section 424. Factual Stipulations, filed September 4, 1973. It has been conceded that Messrs. Leopold and Maidman had authority to conduct that litigation. *See* note 19 *infra.* We think these stipulations establish our subject matter jurisdiction. We have relied upon this theory secondarily because the fuller record discussed in the text itself puts the matter to rest.

**1308**

principles. From a few of the vintage cases it would appear that where a defect in subject matter jurisdiction is shown on the face of the record an untimely attempt to void a judgment could be upheld. *See American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 14–16, 71 S.Ct. 534, 95 L.Ed. 702 (1951); *Mansfield, C. & L. M. Ry. Co. v. Swan,* 111 U.S. 379, 386, 4 S.Ct. 510, 28 L.Ed. 462 (1884); *Capron v. Van Noorden,* 6 U.S. (2 Cranch) 126, 2 L.Ed. 229 (1804); *Dobbs,* 508–09 (criticizing the limitations on absolute finality). Manifestly, the present case is not one which falls into this general category, both because nothing in the original record suggests the defect which defendants have sought to prove and because former counsel for defendants have formally admitted the facts pleaded in that portion of the complaint which alleged the subjection of the plaintiff's social security funds to sections 424 and 501.[19] Whatever the correct synthesis of the numerous intricacies of the finality issue, we do believe that where the facts giving rise to subject

matter jurisdiction have themselves been established in a federal court, that court's judgment is not subject to attack for voidness after the time for appeal has passed. *See Chicot County Drainage District, supra; Stoll v. Gotlieb, supra; Universal Display & Sign Co. v. Del Mar News Agency,* 541 F.2d 142, 143 (3d Cir. 1976); *Lubben v. Selective Service System,* 453 F.2d 645, 649 (1st Cir. 1972).[20]

■ As the foregoing discussion suggests, we would not be required to reopen the judgment under rule 60(b)(4) even if there were now found to be substance to defendants' factual assertions. Our finding in 1974 that sections 424 and 501 in fact violated plaintiff's constitutional rights arose only after the question of the applicability of 424 and 501 had been squarely faced and then put to rest by the former counsel for defendants.[21]

■ We are guided and supported in this view by *DiFrischia v. New York Central R.R.,* 279 F.2d 141 (3d Cir. 1960),[22]

---

**19.** *See* note 16 *supra.*

**20.** We note also that even if defendants' claims were true, the decision in the 1974 action would be valid because the defendants, by whatever statutory authority, would still have been engaged in violating plaintiff's constitutional rights. What defendants are really objecting to, therefore, is the technical standing of plaintiff to question those particular statutory sections which were declared unconstitutional. Standing is, of course, ordinarily to be determined from the pleadings. *Schiaffo v. Helstoski,* 492 F.2d 413 (3d Cir. 1974). Our 1974 decision would certainly not, even if defendants' claims were true, appear to evidence the kind of "usurpation of power" (*Lubben, supra* at 649) required to upset a previous judgment, for there was, even according to defendants' view, power to decide the case. We must also observe that the distinction sometimes made between strictly jurisdictional issues and so-called quasi-jurisdictional issues is not particularly helpful in this case. *See Noble v. Union River Logging R.R.,* 147 U.S. 165, 173, 13 S.Ct. 271, 37 L.Ed 123 (1893) (outlining the distinction). First, as already stated, we do not believe the claimed defect goes strictly to our "power" to decide the case and, secondly, we believe that the issue now raised was in any event finally resolved in 1974 given the circumstances of this case.

**21.** Present counsel for defendants do not now contest the authority of their predecessors to

conduct the 1974 litigation (although they contest their signing the consent decree), hence present counsel concede that previous counsel had authority to stipulate to paragraphs of the complaint. *See* note 16, *supra.* We would in any event, be gravely concerned about any view that would bind us to regard a violation of the internal authorization procedures of the Commonwealth Department of Justice as a basis for invalidating a factual stipulation entered into in the course of litigation. The Justice Department's responsibility is to supervise its duly appointed assistant attorneys general during litigation and not years afterward, and to stand behind representations and stipulations which its legal representatives made in a court of law.

Obviously, state law may be an important guide in determining whether an attorney has the power to enter into a settlement or stipulation in some cases. But at the point where following such law would compromise the ability of federal courts to function effectively in a civil rights suit involving the state as a party, state law need not invariably be followed.

**22.** Even *Misco Leasing, Inc. v. Vaughn,* 450 F.2d 257, 260 (10th Cir. 1971), the case which defendants seem to cite for the proposition that a judgment void when rendered is forever a nullity, qualified its observation with the following pronouncement: "We are not asked to consider whether under any particular circumstances a movant under Rule 60(b) may be

involving the existence *vel non* of diversity jurisdiction. Counsel for the defendant in that case at first asserted the lack of subject matter jurisdiction and then stipulated to its existence. The Court of Appeals reversed the district court for granting defendants' motion to amend its answer to reassert the jurisdictional objection after litigation had progressed to the verge of trial. The court's observations have special meaning in the present case:

> [T]he defendant had its opportunity to have the [jurisdictional] issue heard and to present its position but chose to admit the allegations of plaintiff's complaint. Thereafter it fully participated in the appropriate discovery and pretrial procedures preparatory to trial of the action on the merits. . . . A defendant may not play fast and loose with the judicial machinery and deceive the courts.

We think *DiFrischia* may be placed in the line of cases upholding a court's jurisdiction to determine its own jurisdiction.[23] It is admittedly unusual in its holding that the trial court's jurisdictional determination became unassailable even before trial. But *DiFrischia* is important also because it expresses a candid sensitivity to the inequities which may stem from a blind adherence to the mistaken notion that an attack upon subject matter jurisdiction is forever available in all circumstances.[24]

Not unlike the conduct of defendant in *DiFrischia,* the defendants in the present matter were represented by counsel who chose to conduct their 1974 case by stipulating to facts which established the plaintiff's standing to attack the Pennsylvania statutes. Thus, by their own actions defendants obviated any possible need on plaintiff's part to seek to prove affirmatively her standing in 1974, and then, if a defect appeared in the formulation of the suit, to seek to join additional plaintiffs or defendants or to press for class certification. To grant defendants' motion now (even if they could prove that 424 and 501 were in fact inapplicable) would confer upon the Commonwealth an unnecessary two-year moratorium in disregard of the very important and to date undisputed constitutional rights of patients in Pennsylvania mental institutions. The reasons for foreclosing the jurisdictional attack are notably stronger here than in *DiFrischia* because defendants' motion arises nearly two years after litigation had concluded and about ten months after the implementing regulations had been published in the *Pennsylvania Bulletin* following Justice Department review,[25] and because it appears that the motivation for the present motion is to minimize the cost of noncompliance with the court's decree. Thus, unavailability of 60(b)(4) relief under the circumstances of this case is an additional though independent ground for denial of defendants' motion to vacate and/or modify.[26]

estopped or precluded from filing such a motion." *Misco* was, moreover, a case involving a 60(b)(4) attack upon a *default judgment* raising a personal jurisdiction issue which no court had previously addressed in any form. We thus believe that our present determination is consistent with the theory espoused in *Misco,* for even if a "void" judgment can be attacked under rule 60(b)(4) at any time, the attack will not be successful where, for instance, the jurisdictional issue has already been litigated and decided.

**23.** *DiFrischia* has also been described in an estoppel framework. Stephens, *Estoppel to Deny Federal Jurisdiction—Klee and DiFrischia Break Ground,* 68 Dick.L.Rev. 39 (1964).

**24.** *See Greenbaum v. United States,* 360 F.Supp. 784, 788–89 (Pa. 1973).

**25.** Even defendants' current counsel do not assert that the underlying basis of their present

motion was discoverable only after the 1974 litigation, for defendants' argument is based upon what they now fashion as the at-all-times operative facts about the activities of state revenue agents handling social security monies.

Also, any purported distinction between an active dispute of the jurisdictional facts and the stipulation is, as *DiFrischia* points out at 144, "untenable for . . . such . inquiry was made unnecessary by the admissions of defendant itself . . . ."

**26.** We note also that many of the cases which have upheld a court's jurisdiction to determine its own jurisdiction involved collateral attacks invoking the full faith and credit clause. *See, e. g., Durfee v. Duke,* 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963). The rationale articulated in those cases is that the original litigation is *res judicata* on the issue of subject matter jurisdiction. As observed in *Jordon v. Gilligan,* 500 F.2d 701, 710 (6th Cir. 1974), *cert.*

## III. *The Eleventh Amendment Issue*

In addition to questioning plaintiff's standing as a basis for invalidating the 1975 consent decree, the defendants also assert that the consent decree should be voided because it now stands in violation of the sovereign immunity of Pennsylvania as guaranteed by the Eleventh Amendment. With this conclusion we must also disagree.

■ What the defendants now dispute is the sum of the financial obligations incurred *after* the original decree of July 11, 1974. All of these obligations are, therefore, prospective in nature and have come about only because the Commonwealth, for whatever reason, continued to apply 424 and 501 after the injunction had issued. In *Edelman v. Jordan*, 415 U.S. 651,

667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court found the Eleventh Amendment to be a bar only to orders requiring retroactive expenditure of state funds.[27] The payments required either under the original order or the 1975 consent decree in this case are merely ancillary to the implementation of prospective relief and therefore fall within the exception to the immunity rule.[28] *See McAuliffe v. Carlson,* 520 F.2d 1305, 1308 (2d Cir. 1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3199, 49 L.Ed.2d 1203 (1976). We conclude therefore, that neither the original decree of 1974 nor the 1975 consent decree are void because of impingement upon Pennsylvania's sovereign immunity.[29]

## IV. *Other 60(b) Provisions*

Having disposed of the defendants' 60(b)(4) voidness motions, we turn now to their other motions under rule 60(b).[30]

---

**27.** *Skehan v. Board of Trustees,* 501 F.2d 31, 43 n.7 (3d Cir. 1974), *vacated,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), *on remand,* 538 F.2d 53 (3d Cir. 1976) (*en banc*) instructs that *Edelman* applies to fourteenth amendment claims as well as state law or federal statutory claims.

**28.** The 1975 consent order is quoted in the Appendix at pp. 33–34.

denied, 421 U.S. 991, 95 S.Ct. 1996, 44 L.Ed.2d 481 (1975), in a direct 60(b) attack upon a judgment the principle of *res judicata* does not appear to be applicable. To the extent that *Jordon* suggests that all judgments are subject at all times to 60(b)(4) assault because *res judicata* does not apply, we must disagree. *Cf. Jackson v. Irving Trust Co.,* 311 U.S. 494, 503, 61 S.Ct. 326, 85 L.Ed. 297 (1941) (motion to set aside decree denied where defendant had opportunity to contest jurisdictional defect).

A judgment which issues without subject matter jurisdiction is void, and the principle of *res judicata* does not of its own force breathe vitality into the judgment. What has justified the Court's repeated reference to *res judicata* in jurisdictional collateral attack cases is the existence of jurisdiction to decide jurisdiction, and it is this principle, not *res judicata,* which has had the effect of validating as final what might at one point have been a "void" judgment. *Cf. United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). A court has the same jurisdiction to determine its jurisdiction whether its judgment is attacked collaterally or directly, and the test of whether a judgment should be reopened after the time for appeal has passed should in all important respects be the same in both situations. *See* Dobbs at 496.

**29.** Although we have denied the availability of 60(b)(4) relief with respect to defendants' claims that the plaintiff lacked standing to attack sections 424 and 501, we need not extend the principles enunciated in that discussion to the claim that the consent decree violated the Eleventh Amendment. Suffice it to say that we perceive significant differences in these respective claims. Sovereign immunity is obviously not the kind of issue which can ordinarily be litigated and found as a fact, nor is it one which counsel can influence by their conduct. *Cf. United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 513, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (involving the immunity of an Indian nation from suit).

**30.** These motions fit, so defendants contend, under the classification 60(b)(1), (5) and (6), which provide as follows:

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. . . .

These remaining motions are, as best we can ascertain, based upon the following contentions: (1) that the original decree and hence the 1975 consent decree arose from a mistake about the applicability of 424 and 501; (2) that it is no longer equitable for the original decree and/or the consent decree to have continuing prospective application; and (3) that there are "other reasons" for granting relief including the asserted lack of authority of counsel to enter into the consent decree.

In evaluating these claims, we point out that relief under the above-cited sections of rule 60(b) is not a substitute for appeal. Such 60(b) motions should succeed only when the granting of relief would serve the interests of justice. *See* 7 J. Moore, Federal Practice ¶ 60.19, at 237 (1975) (hereinafter cited as Moore). Certainly, we should not disregard the potentially damaging impact of 60(b) relief upon the party who, through litigation, had obtained what appeared to be a final judgment, for we are in this respect guided by equitable principles. *See Bridoux v. Eastern Air Lines,* 93 U.S.App.D.C. 369, 214 F.2d 207, 210 (1954), *cert. denied,* 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954); *Tozer v. Charles A. Krause Milling Co.,* 189 F.2d 242, 246 (3d Cir. 1951); 7 Moore, ¶ 60.19, at 237–39.

In turning to the merits of defendants' claims we need not linger over their 60(b)(1) assertion that this court and all persons involved in the 1974 litigation were mistaken about the application of 424 and 501.[31] We have already determined that there was no mistake at all either at the time of judgment or at the time of the consent decree. Furthermore, we are not concerned about the correctness or incorrectness of defendants' claims about the inapplicability of state law because of our assessment of the inequities which would arise in permitting the rights of mental patients to be neutralized unnecessarily over a two-year period. As discussed above, the claimed mistake, had it been a mistake, would in all likelihood have been avoided but for defendants' own concessions.

We likewise do not hesitate to deny defendants' 60(b)(5) motion asserting that it is no longer equitable for the judgment to have prospective application. It is our view that the original decree has continuing, albeit delayed, vitality in its interpretation of plaintiffs' constitutional rights which to date remain unchanged by events. *See* 7 Moore ¶ 60.18[8], at 222–223; *cf. id.* ¶ 60.-26[4], at 327–28; *cf. Wallace Clark & Co., Inc. v. Acheson Industries, Inc.,* 394 F.Supp. 393, 395 and n.4 (S.D.N.Y. 1975) (Weinfeld, J.) (rule 60(b)(5) contemplates relief due to later change in law), *aff'd.,* 532 F.2d 846 (2d Cir. 1976). In this respect, too, our conclusion would be the same even if defendants' theory of 424 and 501 were accurate, for the underlying constitutional rights at issue in 1974 and their applicability here have not been questioned.[32]

Finally, we will presume that it is through the vehicle of rule 60(b)(6) that defendants wish to assert their argument that the consent decree was unauthorized and therefore should be vacated. If defendants' assertion were correct for purposes of federal law (and we do not suggest that it is), there has still been no representation that the 1975 consent decree is unnecessary in the protection of adjudicated rights nor has there been a showing that the decree is by its terms inefficient. In

---

**31.** Defendants are really asserting a mistake in the 1974 decision and are also therefore outside the one year period provided in rule 60(b).

**32.** Defendants have also argued that it is impossible for them to obtain judicial declarations of incompetency because of the refusal of the Pennsylvania judiciary to entertain the necessary petitions. Since defendants have interposed that argument, progress has been made (as observed in our preliminary statement), and indications are that the Pennsylvania courts are now moving ahead on the *Vecchione* petitions. But we do not concede that such a delay is any justification for the continuing use of 424 and 501. The simple answer is that the Commonwealth should not act under those sections if it cannot comply with constitutional requirements.

this respect the consent decree is really no different from the 1974 decision which, as observed above, has never been attacked by the defendants as an incorrect articulation of constitutional principle. To the contrary, they have agreed that it is correct, while seeking to evade its impact by means of the arguments described above.

Guided as we now are by equitable considerations, we decline to wipe the slate clean, as it were, of all of defendants' obligations incurred since the original decree and as embodied in the consent decree. Defendants through their original counsel certainly had a fair opportunity to evaluate the terms of the consent decree which they not only approved but published in the *Pennsylvania Bulletin*.[33] In such circumstances the opposing parties in interest should not be expected to absorb the full burden of the claimed failure by defendants' original counsel to follow Justice Department authorization procedures. We further believe it is the responsibility of the Department of Justice, not the plaintiff's counsel or this court, to see that proper authorizations have issued.

In conclusion, the defendants' motion under rule 60(b)(1), (5) and (6) are denied, as are defendants' motions under 60(b)(4).

## APPENDIX

### I.

42 U.S.C. § 405(j) (1970) provides:

(j) When it appears to the Secretary that the interest of an applicant entitled to a payment would be served thereby, certification of payment may be made, regardless of the legal competency or incompetency of the individual entitled thereto, either for direct payment to such applicant, or for his use and benefit to a relative or some other person.

20 C.F.R. §§ 404.1601–1610 provide:

§ 404.1601 Payments on behalf of an individual.

When it appears to the Administration that the interest of a beneficiary entitled to a payment under title II of the Act would be served thereby, certification of payment may be made by the Administration, regardless of the legal competency or incompetency of the beneficiary entitled thereto, either for direct payment to such beneficiary, or for his use and benefit to a relative or some other person as the "representative payee" of the beneficiary. When it appears that an individual who is receiving benefit payments may be incapable of managing such payments in his own interest, the Administration shall, if such individual is age 18 or over and has not been adjudged legally incompetent, continue payments to such individual pending a determination as to his capacity to manage benefit payments and the selection of a representative payee.

§ 404.1602 Submission of evidence by representative payee.

Before any amount shall be certified for payment to any relative or other person as representative payee for and on behalf of a beneficiary, such relative or other person shall submit to the Administration such evidence as it may require of his relationship to, or his responsibility for the care of, the beneficiary on whose behalf payment is to be made, or of his authority to receive such payment. The Administration may, at any time thereafter, require evidence of the continued existence of such relationship, responsibility or authority. If any such relative or other person fails to submit the required evidence within a reasonable period of time after it is requested, no further payments shall be certified to him on behalf of the beneficiary unless for good cause shown, the default of such relative or other

---

**33.** We think it sufficient that the Pennsylvania Department of Justice was plainly aware of the consent decree at or near its outset. Copies of the motion for contempt (which led to the 1975 consent decree) were served upon Robert Kane, Attorney General of the Commonwealth. Defendant Frank S. Beal, Secretary of the Department of Welfare, was apprised by Marx

Leopold of that decree. Factual Stipulations, filed October 1, 1976, ¶¶ 14, 23. By anyone's description the Commonwealth should not have been surprised by the 1975 decree. Beal thereafter signed the certification of publication of the decreed regulations and those regulations were reviewed by the Justice Department. F.S. ¶¶ 25, 27.

person is excused by the Administration, and the required evidence is thereafter submitted.

§ 404.1603  Responsibility of representative payee.

A relative or other person to whom certification of payment is made on behalf of a beneficiary as representative payee shall, subject to review by the Administration and to such requirements as it may from time to time prescribe, apply the payments certified to him on behalf of a beneficiary only for the use and benefit of such beneficiary in the manner and for the purposes determined by him to be in the beneficiary's best interest.

§ 404.1604  Use of benefits for current maintenance.

Payments certified to a relative or other person on behalf of a beneficiary shall be considered as having been applied for the use and benefit of the beneficiary when they are used for the beneficiary's current maintenance—i. e., to replace current income lost because of the disability, retirement, or death of the insured individual. Where a beneficiary is receiving care in an institution (see § 404.1606), current maintenance shall include the customary charges made by the institution to individuals it provides with care and services like those it provides the beneficiary and charges made for current and foreseeable needs of the beneficiary which are not met by the institution.

§ 404.1605  Conservation and investment of payments.

Payments certified to a relative or other person on behalf of a beneficiary which are not needed for the current maintenance of the beneficiary except as they may be used pursuant to § 404.1607, shall be conserved or invested on the beneficiary's behalf. Preferred investments are U.S. Savings Bonds, but such funds may also be invested in accordance with the rules applicable to investment of trust estates by trustees. For example, surplus funds may be deposited in an interest or dividend bearing account in a bank or trust company or in a savings and loan association if the account is either federally insured or is otherwise insured in accordance with State law requirements. Surplus funds deposited in an interest or dividend bearing account in a bank or trust company or in a savings and loan association must be in a form of account which clearly shows that the representative payee has only a fiduciary, and not a personal, interest in the funds. . . A representative payee who is the legally appointed guardian or fiduciary of the beneficiary may also register U.S. Savings Bonds purchased with funds from title II payments in accordance with applicable regulations of the U.S. Treasury Department (31 CFR 315.5 through 315.8). Any other approved investment of the beneficiary's funds made by the representative payee must clearly show that the payee holds the property in trust for the beneficiary.

§ 404.1606  Use of benefits for beneficiary in institution.

Where a beneficiary is confined in a Federal, State or private institution because of mental or physical incapacity, the relative or other person to whom payments are certified on behalf of the beneficiary shall give highest priority to expenditure of the payments for the current maintenance needs of the beneficiary, including the customary charges made by the institution (see § 404.-1604) in providing care and maintenance. It is considered in the best interests of the beneficiary for the relative or other person to whom payments are certified on the beneficiary's behalf to allocate expenditure of the payments so certified in a manner which will facilitate the beneficiary's earliest possible rehabilitation or release from the institution or which otherwise will help him live as normal a life as practicable in the institutional environment.

§ 404.1607  Support of legally dependent spouse, child, or parent.

If current maintenance needs of a beneficiary are being reasonably met, a relative or other person to whom payments are certified as representative payee on behalf of the beneficiary, may use part of the pay-

ments so certified for the support of the legally dependent spouse, a legally dependent child, or a legally dependent parent of the beneficiary.

§ 404.1608 Claims of creditors.

A relative or other person to whom payments under Title II of the Act are certified as representative payee on behalf of a beneficiary may not be required to use such payments to discharge an indebtedness of the beneficiary which was incurred before the first month for which payments are certified to a relative or other person on the beneficiary's behalf. In no case, however, may such payee use such payments to discharge such indebtedness of the beneficiary unless the current and reasonably foreseeable future needs of the beneficiary are otherwise provided for.

§ 404.1609 Accountability.

A relative or other person to whom payments are certified as representative payee on behalf of a beneficiary shall submit a written report in such form and at such times as the Administration may require, accounting for the payments certified to him on behalf of the beneficiary unless such payee is a court-appointed fiduciary and, as such, is required to make an annual accounting to the court, in which case a true copy of each such accounts filed with the court may be submitted in lieu of the accounting form prescribed by the Administration. If any such relative or other person fails to submit the required accounting within a reasonable period of time after it is requested, no further payments shall be certified to him on behalf of the beneficiary unless for good cause shown, the default of such relative or other person is excused by the Administration, and the required accounting is thereafter submitted.

§ 404.1610 Transfer of accumulated benefit payments.

A representative payee who has conserved or invested funds from Title II payments certified to him on behalf of a beneficiary shall, upon direction of the Administration, transfer any such funds (including interest earned from investment of such funds) to a successor payee appointed by the Administration, or, at the option of the Administration, shall transfer such funds, including interest, to the Administration for recertification to a successor payee or to the beneficiary.

II.

50 P.S. §§ 4424, 4501 (1969) provide:

§ 4424. Funds of persons admitted or committed to State operated facilities.

Where no guardian has been appointed for a mentally disabled person admitted or committed to a State operated facility all money and other personal property of such person shall be handled in the following manner, unless the director determines that such person's recovery or well-being will be promoted by his own handling of such money or personal property:

(1) The authorized agent of the Department of Revenue shall, without application to any court, take custody of, receive and manage in accordance with this section any money or other personal property in such person's possession at the time he is admitted to a facility and any gifts, legacies, pensions, insurance payments, retirement benefits or payments, old age and survivors' insurance, or any other benefits or payments to which such person covered by the provisions of this act may be entitled.

(2) The revenue agent shall, upon the director's request, turn over to the director the sum of one hundred dollars ($100) to be used as such person's petty cash fund. Funds so held by the director shall be disbursed at his discretion to promote the welfare of such person. The revenue agent shall, upon the director's request, restore the balance in each such person's petty cash fund to one hundred dollars ($100). For special purposes, the director may request funds for such person up to five hundred dollars ($500).

(3) Unless a guardian has been appointed and qualified, the revenue agent shall hold, apply and dispose of all funds in accordance with regulations promulgated by the department.

(4) Whenever the money and other personal property of such person exceeds two thousand five hundred dollars ($2,500) in value, the revenue agent shall request the Department of Justice to apply for the appointment of a guardian of such person's estate in accordance with the act of February 28, 1956 (P.L. 1154), known as the "Incompetents' Estates Act of 1955."

(5) When such guardian has been appointed and qualified pursuant to this section or in any other manner, he shall be entitled to receive from the revenue agent all money and other personal property in the custody of such revenue agent belonging to the person for whom he has been appointed guardian. All funds transmitted to the guardian shall be accompanied by a statement certified as true and correct and setting forth, in detail, a full accounting of such person's funds.

(6) Whenever such money and other personal property exceed two thousand five hundred dollars ($2,500) in value and the court rules that a guardianship is not appropriate, then such money and other personal property shall be handled in accordance with this section.

(7) The revenue agent and the director each shall at all times have on file with the Secretary of the Commonwealth a bond at least equal to the total value of all such money and other personal property in his possession.

(8) The revenue agent and the director shall each open interest bearing accounts in federally insured banks, banking institutions, trust companies or savings and loan associations and shall deposit therein all such moneys in their possession. Amounts on deposit in such accounts shall not exceed the amount of federal insurance coverage. All interest earned on such accounts less costs of administering such accounts shall be allocated to each individual person's account in the same proportion that said account bears to the total of all accounts at the time the interest is calculated.

(9) All moneys and other personal property of any mentally disabled person admitted or committed to a State operated facility which is held by the director or revenue agent at the time this act becomes effective shall be managed in accordance with the provisions of this section after said date. This paragraph shall not apply to interest that is accrued on such person's funds prior to the effective date of this act.

(10) Upon the death of any such person the director shall transfer to the revenue agent all money and other personal property belonging to such person. The revenue agent shall continue to serve as provided in this section, with respect to any sums due such person as of the date of his death, or as burial allowances. After the payment of burial expenses and satisfaction of such person's obligation to the Commonwealth, the balance of such funds, if any, shall be disposed of in accordance with existing statutes governing decedents' estates except those veterans' benefits which by federal law are to be returned to the United States.

§ 4501. Liability of mentally disabled persons.

Whenever public funds are expended under any provision of this act on behalf of a mentally disabled person, the governmental body expending such funds may recover the same from such person subject to the regulations of the department and for this purpose liability is hereby imposed upon such person admitted, committed or otherwise receiving any service or benefit under this act for all costs, payments or expenditures with reference thereto, including but not being limited to the costs of admission or commitment, transportation, treatment, training, maintenance, complete care, partial care or aftercare and discharge.

III.

The 1975 consent decree is as follows *:

* The regulations published in the *Pennsylvania Bulletin* on April 14, 1975, pursuant to this order have not been included.

## ORDER

AND NOW, this 4th day of April, 1975, upon consideration of the agreement of the parties as to proper procedures and regulations for implementation of this Court's Opinion and Order of July 11, 1974, it is hereby ORDERED and DECREED:

1. The regulations attached hereto as Exhibit A shall be fully adopted by the Defendant Secretary of Public Welfare Frank Beal, on behalf of the Department of Public Welfare, and said regulations shall be published as immediately effective in the Pennsylvania Bulletin within fifteen (15) days. Within twenty (20) days, Defendant Beal, and his counsel, Marx Leopold, shall certify under oath to this Court that such adoption and publication has occurred.

2. The Defendants Beal, Clarke and Shoemaker shall arrange for payment to the named Plaintiff, Elvira Vecchione, in full the sum of $1,253.85, representing the sum wrongfully withheld from her, within ten days. Within fifteen (15) days, said defendants and their counsel, Marx Leopold, shall certify to this Court under oath that such payment has taken place.

3. Defendant Frank Beal, Secretary of the Department of Public Welfare, shall order, within fifteen (15) days, the Directors and Revenue Agents of every state mental institution and facility to determine and report to Defendant Beal the names and addresses of all present and former patients whose funds and property were withheld under 50 P.S. § 4424 or applied to their maintenance under 50 P.S. § 4501 since July 11, 1974, and, in addition, the amounts withheld or applied to maintenance for each such patient or former patient. The Defendant Beal shall obtain and forward these reports to the Court and all plaintiffs' counsel within sixty (60) days of this Order.

4. Within ninety (90) days of this Order, Defendant Beal shall assure that all such amounts withheld under 50 P.S. § 4424 shall be accounted for and that all such amounts applied to maintenance under 50 P.S. § 4501 shall be paid back to the patients or former patients, including interest earned. Such payment shall be accompanied by a full statement of account to all such patients and former patients. Within one hundred (100) days of this Order, Defendant Beal, and his counsel, Marx Leopold, shall file with this Court and all plaintiffs' counsel a statement certifying under oath the names, addresses, amounts withheld or applied to maintenance and amounts paid back to each former or present patient.

5. Plaintiff Walter Buress' uncontested motion to intervene is hereby granted and Defendant Beal shall arrange for payment to Walter Buress of the full sum wrongfully withheld from him since July 11, 1974, such payment to be made within ten (10) days. Within fifteen (15) days, Defendant Beal, and his counsel, Marx Leopold, shall certify to this Court under oath that such payment has taken place.

6. The failure to accomplish any of the above acts by the time specified, or the failure to file required certifications with the Court, shall be considered Contempt of this Court and will, after hearing, subject contemnors to fine or other appropriate sanction. The Court shall retain jurisdiction of this matter until the parties shall have fully complied with the terms of this Order.